John D. SEYMOUR, Plaintiff-Appellee,

v.

OLIN CORPORATION, A Virginia Corp., and United Steelworkers of America, AFL–CIO–CLC, Local 8018, Defendants-Appellants.

No. 80–5227.

United States Court of Appeals, Fifth Circuit.*
Unit B

Jan. 22, 1982.

* Former Fifth Circuit case, Section 9(1) of Public Law 96–452—October 14, 1980.

Ian P. Spier, Asst. Labor Counsel, Stamford, Conn., Holland & Knight, Harry O. Thomas, Tallahassee, Fla., John C. Falkenberry, Birmingham, Ala., Wilfred C. Varn, Tallahassee, Fla., Bredhoff, Gottesman, Cohen, Chanin, Weinberg & Petramalo, Michael Gottesman, Washington, D.C., for defendants-appellants.

Daniel S. Dearing, Tallahassee, Fla., for plaintiff-appellee.

Before JONES, TJOFLAT and ANDERSON, Circuit Judges.

R. LANIER ANDERSON, III, Circuit Judge:

The plaintiff-appellee, John D. Seymour, filed this action in the district court under § 301 of the Labor Management Relations Act, 29 U.S.C.A. § 185 (West 1978), against defendants-appellants, Olin Corporation (Olin) and United Steelworkers of America, AFL–CIO–CLC, Local 8018 (Union). Seymour alleged that Olin, his former employer, had discharged him without just cause in violation of the collective bargaining agreement between Olin and the Union, and that the Union did not satisfy its duty of fair representation. Seymour also claimed that Olin had defamed him, but the trial judge entered a directed verdict for Olin on this count. A jury returned a verdict in Seymour's favor on both the wrongful discharge and the breach of fair representation counts, and the jury set damages against Olin at $139,177.02. The trial judge, having determined that the measure of damages against the Union would be the amount of fees which would reasonably be due to Seymour's attorney, held a hearing on the subject of attorney's fees and found the Union to be liable for $39,368.75.

In this appeal, defendants argue that the trial court committed reversible error in several respects. First, both defendants claim that the court erred by failing to direct a verdict against Seymour since there was no evidence which would support a jury

verdict that the Union had breached its duty of fair representation.[1]  Second, Olin argues that the trial court committed error by refusing to allow counsel for Olin to argue to the jury that Seymour had failed to prove his allegations of defamation and that the court had directed a verdict in Olin's favor with respect to that cause of action.  Third, Olin argues that the trial court should not have awarded prospective damages against Olin, but at most should have ordered that Seymour be reinstated. Fourth, Olin claims that the trial court incorrectly apportioned damages between Olin and the Union.  Fifth, the Union advances the argument that the attorney's fee award against it was excessive as a matter of law.  Finally, both defendants raise challenges to the specific wording of certain jury instructions.  After a review of the record and the law pertaining to this case, we reject each of these arguments and affirm the judgment of the district court.

### I.  FACTS.

John Seymour was hired by Olin Corporation to work as an electrician in its St. Marks, Florida, plant in September 1976. Seymour had previously been employed by several other companies as an electrician, and, for a time, he had been self-employed. In August 1977, Seymour approached Mr. J. N. Knowles, an electrical subcontractor working at the St. Marks plant, offering to sell some electrical wire to Knowles. Seymour had apparently done business with Knowles when Seymour was self-employed. At trial Seymour testified that he had obtained the wire from his brother and that he had stored the wire in the carport at his home.  Knowles, however, reported to Olin officials that Seymour had offered to sell him wire that belonged to Olin.  After discussing the matter, Olin officials told Knowles to purchase the wire from Seymour.  In September 1977, Knowles took possession of the wire, agreeing that Seymour would be paid at a later date.

Olin officials and Knowles devised a plan to apprehend Seymour if he attempted to receive payment for the allegedly stolen wire.  In the morning of Wednesday, October 5, 1977, Knowles delivered Seymour a check for $80, half of the market value of the wire.  When Seymour took the check, Knowles signaled to the plant protection supervisor, Mr. Alan Harvey, by removing his hard hat.  Harvey then confronted Seymour, stating, "I know about your wire deal, let's go to Personnel."

Harvey then took Seymour to the plant personnel manager, Mr. Michael Mangiere. Mr. Mangiere asked if Seymour would like to have a union representative present, but Seymour declined the offer.  With other company officials present, including Mr. Buster Mathis, the superintendent of Seymour's department, Mangiere informed Seymour that he was accused of stealing company property.  A discussion ensued, and it is Seymour's testimony that Mangiere threatened to "make things muddy" for Seymour if Seymour decided to cause any trouble.  At trial, Mangiere denied threatening Seymour.  Mangiere testified that he told Seymour that he could turn the matter over to the sheriff, but would not under the circumstances.  At the close of this meeting, Mangiere terminated Seymour for violating Company Rule 5, which rule provides that an employee may be subject to immediate discharge for theft of company property.  Article II, Section 8 of the collective bargaining agreement between Olin and the United Steelworkers of America, Local 8018, allows Olin to discharge employees for cause.

Shortly after being terminated, Seymour, a member of the Steelworkers Local 8018, telephoned Mr. Terry Faircloth, president of the local union, to inform Faircloth of the termination.  Faircloth told Seymour that he would investigate the matter.  Al-

---

1.  Olin presses this argument on the theory that Seymour must establish a breach by the Union of its duty of fair representation before Olin may be held liable on the underlying claim of wrongful discharge, since Seymour did not exhaust his grievance remedies as required by the collective bargaining agreement.  Olin does not, however, raise any claim of error with respect to the jury determination that the discharge was without just cause.

though the chronology of the following events is not completely clear from the record, it appears that Faircloth discussed the matter with Mangiere, met with Seymour at a convenience store near the plant, and then conducted further interviews and inspected the wire in question.

At the suggestion of his wife sometime that day, Seymour drove to Tallahassee and retained Daniel Dearing as counsel. Seymour and his attorney discussed the termination, and Dearing suggested that he should send a letter to Olin on Seymour's behalf urging that Olin had made a mistake in firing Seymour. This letter was sent the following day, Thursday, October 6, 1977, and Olin received it on Friday, October 7.

Later on October 5, the day of the discharge, Seymour and Faircloth met in the parking lot of the plant. According to the testimony of Seymour, Faircloth was willing to press Seymour's grievance under the procedure outlined in Article 8 of the collective bargaining agreement. However, when Faircloth learned during the course of the meeting that Seymour had retained a lawyer, Faircloth stated, according to Seymour, "[W]e can't help you ... because a lawyer cannot sit in on any of our union business. . . . Now, if you get rid of your lawyer, fire your lawyer, we will take the case." (Record vol. IV at 75). Seymour responded that he would not fire his lawyer. Faircloth met with Seymour again the next day, Thursday, October 6, and essentially repeated the same statement, and he asked Seymour whether Seymour wanted to pursue the matter with his lawyer or with the union. Seymour's response is unclear from his testimony. On Friday, October 7, Faircloth obtained a grievance handbook and union constitution from the union hall and gave them to Seymour.

The following Monday, October 10, the union grievance chairman, Wayne McKenzie, visited Seymour at his home. Under the grievance procedure outlined by the collective bargaining agreement, Monday was the final day on which Seymour could file a grievance. However, as a matter of shop practice, Olin did not insist upon strict adherence to the first two "steps" of the grievance procedure which contained the initial three day time limit. (Record, vol. V at 163). McKenzie told Seymour that under a union rule, there was nothing that the Union could do for him unless he got rid of his lawyer, and that if he was going to do so he had better hurry up, since his time to file a grievance was running out. No grievance was ever filed with the company. Seymour then initiated the suit against Olin and the Union which forms the subject matter of this appeal.

## II. DUTY OF FAIR REPRESENTATION.

Both appellants argue that, as a matter of law, a reasonable jury could not have found that the Union breached its duty of fair representation. They note that even taken in the light most favorable to Seymour, the evidence adduced at trial does not support a finding that the Union acted arbitrarily in failing to press a grievance for Seymour. Therefore, the Union and Olin seek reversal of the district court's refusal to direct a verdict in their favor.

The argument of appellants is best summarized in the approach taken by the Union at oral argument and in their post-argument submission to this court. The Union argues that what it characterizes as Seymour's theory of recovery in this case—that the Union officials conditioned their representation of Seymour upon Seymour's firing his attorney whom he had retained to advise him with respect to potential criminal proceedings—is not supported by the facts of this case, because the record shows that Seymour retained his attorney solely to get his job back. The Union contends that the actions of Union officials were within the scope of the Union's right, under the National Labor Relations Act and the collective bargaining agreement, to act as the exclusive representative of employees in the grievance proceedings. As exclusive representative, the Union argues that it could properly require Seymour to choose between union representation and separate

pursuit of the grievance through his attorney.[2]

We reject the Union's contention because we believe that the Union's characterization of Seymour's argument is unnecessarily limited. Although he does suggest that the Union prohibited him from retaining counsel to advise him with respect to criminal proceedings, Seymour also argues that the Union refused to represent him even if he was merely consulting with an attorney with respect to his discharge. It is our opinion that there is evidence in the record to support a jury finding that Seymour reasonably understood the statements of the Union officials to mean that, if the Union handled the grievance, Seymour could not have a lawyer with whom to consult regarding his termination. Since we conclude that it is arbitrary, thus to condition the Union's assistance in the grievance process, we need not examine the record for support of the more limited theory that the Union prohibited Seymour from consulting an attorney with respect to criminal proceedings.

In order to prevail on this point, appellants must show that, as a matter of law, there was no jury issue presented by the evidence adduced at trial relating to the Union's duty of fair representation, and therefore, the district court should have directed a verdict for the appellants. In reviewing the record in this context, the court of appeals should "consider all of the evidence—not just that evidence which supports the non-movers case—in the light and with all reasonable inferences most favorable to the party opposed to the motion." *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc); *Palmer v. Fuqua*, 641 F.2d 1146, 1153 (5th Cir. 1981). In order to support a denial of a motion for a directed verdict, there must be "substantial evidence opposed to the motion, that is,

evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Boeing Co. v. Shipman*, 411 F.2d at 374. In examining the evidence, however, the court may not determine questions of credibility or weigh conflicting evidence or inferences. *Id.* at 375.

Applying this standard to the record before us, we find that there was substantial evidence to justify the district court's decision to send the duty of fair representation issue to the jury. The view of the facts most favorable to Seymour indicates that after he was discharged by Mangiere, Seymour retained counsel. When they learned that Seymour had hired a lawyer, the Union officials made no inquiry into how Seymour intended to use the attorney, but insisted that the Union could not help him unless he fired his attorney. Seymour was so informed on three different occasions by two different Union officials prior to the running of the time for filing the grievance. There is no indication in the record that the Union officials had any knowledge of any contact between Seymour's lawyer and the company at the time that the officials told Seymour that he must get rid of his attorney.

Based on these facts, we hold that a jury could have reasonably found that the Union officials informed Seymour that he must fire his attorney before they would press his grievance, and that he understood those statements as prohibiting him, if he wanted Union assistance, from consulting with counsel about the termination without regard to whether counsel would attempt to take any role whatsoever in the grievance proceedings. We now turn to the question of whether such an interpretation of the facts here would justify the conclusion that the Union violated its duty of fair representation.

---

**2.** Under § 9(a) of the National Labor Relations Act, 29 U.S.C.A. § 159(a) (West 1973), Seymour could seek redress for grievances without the assistance of the Union where such action is not inconsistent with the collective bargaining agreement. However, the employer is not required to entertain such a presentation and can insist upon handling grievances exclusively with the Union pursuant to the collective bargaining agreement. *See Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 61 n.12, 95 S.Ct. 977, 984 n.12, 43 L.Ed.2d 12 (1975).

As the collective bargaining representative of the workers at Olin's St. Marks facility, the Union was empowered to act as the exclusive representative of the employees working there under 29 U.S.C.A. § 159(a) (West 1973). In order to ensure that this power is not abused, an exclusive bargaining agent is under a duty to represent fairly all the employees within the appropriate bargaining unit with respect to matters arising out of the collective bargaining agreement with the company. *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967); *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (1964).

In the context of employee grievances, the duty of fair representation is not a straitjacket which forces unions to pursue grievance remedies under the collective bargaining agreement in every case where an employee has a complaint against the company. Individual employees do not have an absolute right to have their grievances taken through the arbitration process. *Vaca v. Sipes*, 386 U.S. at 191, 87 S.Ct. at 917. A union is accorded considerable discretion in dealing with grievance matters, and it may consider the interests of all its members when deciding whether or not to press the claims of an individual employee. Thus, the failure of a union to process an employee's grievance, even if it is possible to demonstrate that the grievance is meritorious, does not necessarily give rise to a breach of the duty of fair representation. *Id.* at 192–3, 87 S.Ct. at 917–18; *Turner v. Air Transport Dispatchers' Association*, 468 F.2d 297, 299 (5th Cir. 1972). The duty of fair representation is breached only when a union's treatment of an employee's complaint is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. at 190, 87 S.Ct. at 916; *Christopher v. Safeway Stores, Inc.*, 644 F.2d 467, 472 (5th Cir. 1981).

Seymour contends that the statements which the Union officials made to him and the related failure of the Union to pursue a grievance on his behalf were arbitrary actions and therefore constitute a violation of the Union's duty of fair representation. The standard for determining whether or not union conduct is arbitrary is set forth in *Tedford v. Peabody Coal Co.*, 533 F.2d 952 (5th Cir. 1976). In *Tedford*, the court rejected a worker's claim that the union had treated him arbitrarily by agreeing to an interpretation of the collective bargaining agreement which rendered Tedford's grievance meritless. The court held an action by a union is not arbitrary if it is "(1) based upon relevant, permissible union factors which excludes [sic] the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of a fair and impartial consideration of the interests of all employees." 533 F.2d at 957 (footnotes omitted). Applying this standard to the instant case, we hold that the conduct of the Union officials in prohibiting Seymour from retaining counsel with whom to consult with respect to his discharge did not satisfy the first prong of the *Tedford* test and therefore is arbitrary.

The Union argues that the actions of its officials were based on the legitimate concern of the Union to protect its role as exclusive representative of the employees in its bargaining unit. It is, of course, permissible for a union to safeguard its interests in speaking for all of the employees it represents in dealing with a company in matters relating to the collective bargaining agreement. However, the Union's actions here exceeded the limits of its right of exclusive representation and ignored a substantial interest of Seymour and all employees in the bargaining unit—the interest in obtaining informed legal advice from competent counsel of one's own choosing.

The contours of the Union's right of exclusive representation are set by § 9(a) of the National Labor Relations Act, 29 U.S.C.A. § 159(a) (West 1973), the collective bargaining agreement and shop practice. The contract in this case does not directly address the issue of whether an employee may obtain other counsel to represent him in grievance or arbitration proceedings. However, under the statute and Article 2 of

the collective bargaining agreement, the Union is the exclusive bargaining representative of all production and maintenance employees at Olin's St. Marks facility. Since the grievance procedure is considered to be an important part of the collective bargaining process, *see United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *Malone v. United States Postal Service*, 526 F.2d 1099, 1108 (6th Cir. 1975), it is arguable that the Union's role as exclusive representative extends to the grievance and arbitration process. Indeed, the terms of Articles 8 and 9 of the contract appear to contemplate that the Union will be the party with whom the company will deal in the grievance process.[3] Therefore, it is reasonable to interpret the contract as empowering the Union to act as exclusive representative of employees in grievance proceedings.

The exclusive right to represent employees in the grievance process allows the Union to limit the participation of privately retained counsel in grievance proceedings.[4] However, we need not decide the outer limits on the Union's ability to insulate the grievance process from outside counsel,[5] for whatever powers are conferred upon the Union by statute or the collective bargaining agreement, the Union has no permissible interest in prohibiting employees from retaining private counsel merely for the purpose of consultation. A union's interest in acting as exclusive spokesman for its employees in most cases may justify, although it is not necessary to so hold in this case, a union rule that employees' private attorneys may not actively participate in the grievance proceedings and related union meetings.[6] However, a union's ability to represent all its employees is not compromised by the mere fact that an employee is consulting with an attorney regarding matters related to his discharge.

There are important policy concerns which strongly support this rule. Attorneys play an important role in advising individuals who are not versed in the complexities of the law. Members of our society often require information and guidance of a nature that lawyers are uniquely capable of conferring. The intricacies of our labor law often will mean that a layman will be either confused by or wholly ignorant of its provisions. Employees have a legitimate interest in discussing their rights

3. Step one of the grievance process outlined in Article 8 of the collective bargaining agreement states that the employee shall discuss his grievance with his supervisor within three working days of the occurrence of the event which gives rise to the grievance. This is the only point in the process at which direct participation of the aggrieved employee is called for by the contract. As noted above, the shop practice at the St. Marks facility apparently did not require the parties to comply with steps one and two. (*See* p. 206, *supra* ).

4. Some courts have held that independently retained counsel may not participate in grievance proceedings in which the union acts as the grievant's representative, *see Malone v. United States Postal Service, supra; Laney v. Ford Motor Co.*, 95 L.R.R.M. 2003 (D.Minn.1977). One court rejected an employee's claim of unfair representation by the union where the union insisted on its role as exclusive representative and refused to discuss the case or review the evidence with plaintiff's counsel. *See Schleper v. Ford Motor Co.*, 107 L.R.R.M. 2500, 2502 (D.Mich.1980).

5. Delimiting the full extent of this power of the Union would require answering such questions as whether the Union may prohibit the mere *presence* of private counsel at grievance proceedings or meetings, even when the attorney takes no active role. This issue is, of course, further complicated when there is a potential for criminal proceedings arising out of the incident that gives rise to the grievance, as in this case. In most instances, a union's power in this regard can only be determined by an analysis of the collective bargaining agreement and the particular facts presented by the individual case. We leave the decision of such difficult questions to another day.

6. Although it is arguable that the Union may prohibit an employee's private counsel from independently conferring with the company with respect to settlement of the grievance, there is no evidence in the record which indicates that the Union officials here had any knowledge of the letter that Seymour's attorney wrote to Olin. In fact, no negotiations ever took place between Seymour's attorney and Olin, since Olin's ·response to that letter informed Seymour's attorney that Olin would deal only with the Union.

and obligations under the law with an informed but neutral third party. This is especially true where the interests of the union might deviate from those of an individual employee. Indeed, an employee who suspects that he is not receiving fair representation from the union would be placed in an untenable position if his mere consultation with a lawyer about his rights under the grievance process would justify the union's refusal to press his grievance any further. The duty of fair representation would be reduced to a mere fiction in such a case. Employees must be free to obtain legal advice with respect to their rights under the labor law, and unions may not impair this process.

Since the reading of the record most favorable to Seymour indicates that the jury could properly have found that the Union conditioned its representation upon Seymour's firing his lawyer, we hold that the Union acted arbitrarily. Accordingly, the district judge properly sent the issue of whether the Union had breached its duty of fair representation to the jury.

### III. DEFAMATION COUNT.

The complaint in this action included a count charging that Olin Corporation had defamed Seymour. Seymour's counsel mentioned this allegation in his opening statement to the jury. The only testimony which Olin points to on this issue was Seymour's testimony that his son had heard on the school playground that Seymour "was going to prison because [he] had stole a bunch of stuff and got fired." (Record, vol. IV at 81). At the close of plaintiff's case, the district court granted a directed verdict in Olin's favor with respect to the defamation count.

■ Prior to the closing arguments to the jury, counsel for Olin requested that the court permit him to argue to the jury that counsel for Seymour had promised in his opening statement to prove the defamation count and that he had failed to do so as evidenced by the directed verdict in Olin's favor. (Record, vol. VII at 26–27).

On appeal, Olin argues that the refusal of the district court to let counsel for Olin make this argument to the jury deprived him of a valuable trial technique and allowed the jury to consider highly prejudicial testimony. We find no merit in these contentions.

Olin argues that its counsel was denied the opportunity "to pound Seymour's counsel to pieces about his unfulfilled promises." Brief for Olin at 39. It notes that the jury could infer from the grant of the directed verdict and Seymour's opening statement that Seymour's entire case was suspect. We believe that the district court properly refused to allow Olin to argue to the jury that it should make such an inference. In essence, Olin's argument would have encouraged the jury to give the directed verdict on the defamation count far more effect than it warranted. The district court does not express any view on the merits of other claims in a case when it directs a verdict on one count, and any attempt to persuade the jury to make an inference that it does is impermissible.

■ Counsel for Olin neither moved to strike the evidence that had been introduced to support the defamation count, nor requested an instruction that the jury disregard such evidence, nor in any way mentioned to the district judge any potential prejudicial effect that would ensue from a failure to strike such evidence from the record. Accordingly, Olin has waived any claim of error in this respect. Where no request for a jury instruction is made, a party may not generally assign as error a trial court's refusal to give such an instruction. See *Bissett v. Ply-Gem Industries, Inc.*, 533 F.2d 142, 145 (5th Cir. 1976); Fed. R.Civ.P. 51. Failure to request an instruction or make a proper objection is excused only where the prejudicial effect of failing to give such an instruction is so clear that the district judge should make the instruction on his own motion. Here, the limited testimony relating to the defamation count is not so clearly prejudicial to justify reversal in this case.

## IV. PROSPECTIVE DAMAGES.

Olin next argues that the district court erred by failing to order reinstatement and by allowing the jury to award prospective damages to Seymour. In his prayer for relief, Seymour did not request reinstatement, but asked for back pay and prospective damages against Olin for the wrongful discharge. Olin did not object to this prayer for relief in its responsive pleadings, and at no time did it make a motion to strike this portion of the prayer for relief. After the close of evidence in the case, immediately before the closing arguments, however, counsel for Olin objected to the jury charge which allowed the jury to award prospective damages.

■ The parties concede that when wrongful discharge suits are submitted to arbitration, the normal remedy is reinstatement with back pay. In § 301 suits, however, it is clear that the federal courts have the power to order either reinstatement or prospective damages. *See Vaca v. Sipes*, 386 U.S. at 196, 87 S.Ct. at 919; *Soto Segarra v. Sea-Land Service, Inc.*, 581 F.2d 291, 297 (1st Cir. 1978).

Olin argues that where a company is found to have wrongfully discharged an employee, the court must award reinstatement unless it would not be feasible for the employer to reinstate the employee. The question of whether prospective damages can be awarded only where the equitable remedy of reinstatement is unavailable has not been squarely addressed in this circuit. A strong argument can be made that reinstatement should be awarded where possible since that is the normal practice in arbitration and since it is often difficult to value future earnings. However, some courts have characterized reinstatement as the more drastic and therefore less favored

remedy in § 301 suits.[7] In the instant case, we need not decide this issue. We assume *arguendo* the standard urged by Olin—*i.e.*, that prospective damages may be awarded only if reinstatement is impractical—but even under this standard the district court in the present case did not abuse its discretion in allowing the jury to award prospective damages.

■ There is substantial support in the record for the decision to award prospective damages on the ground that reinstatement was impractical in this case. There is evidence that in the period following this discharge, Seymour was unable to find work in the Tallahassee area. Seymour eventually found work in Atlanta, leaving his family in Wakulla County. After approximately a year, the Seymours sold their house and Seymour's family joined him in Atlanta. (Record, vol. IV at 82–3). Under these circumstances, the district court could properly conclude that reinstatement would be impractical because of the further dislocation of Seymour and his family that would be involved.

In addition, counsel for Olin led both the court and the parties to believe that reinstatement was not a feasible alternative in this case and allowed the case to be tried before the jury on the theory that any prospective relief awarded in the case should be in the form of damages. In his order denying defendants' motions for judgment notwithstanding the verdict and for a new trial, the district judge found that Olin had made " 'specific and definite' refusals, through counsel, to countenance the remedy of reinstatement, should the plaintiff prevail." (Record, vol. II at 479). Even though Seymour's complaint requested prospective damages and not reinstatement, Olin made no suggestion to the court

---

7. For instance, in *Soto Segarra v. Sea-Land Service, Inc., supra,* the First Circuit vacated an award of reinstatement where the plaintiff sought damages alone and there was a worsening of plaintiff's physical condition since his discharge. The court noted that it had held in *de Arroyo v. Sindicato de Trabajadores Packinghouse, AFL–CIO,* 425 F.2d 281, 292 (1st Cir.), *cert. denied,* 400 U.S. 877, 91 S.Ct. 117, 27 L.Ed.2d 114 (1970), that "reinstatement was an alternative remedy but that the difficulty in quantifying future lost earnings did not automatically require resorting to the more drastic remedy of reinstatement. Moreover, reinstatement is only appropriate where not impractical." *Soto Segarra v. Sea-Land Service, Inc.,* 581 F.2d at 297.

in responsive pleadings, motions or otherwise before trial that reinstatement was the proper remedy or that it was feasible in this case. Indeed, Olin's requested jury instruction No. 16 appears to contemplate an award of prospective damage if the jury were to find for Seymour. (Record, vol. II at 249). Olin did not object to the presentation of evidence relating to prospective damages on the ground that it was irrelevant because reinstatement was the proper remedy. In fact, Olin's first objection to an award of prospective damages occurred after the case had been fully tried to the jury. At the charge conference, which was held following the close of evidence in the case, counsel for Olin took the position that equitable relief, preferably an order to arbitrate, was the proper remedy in the case. (Record, vol. VI at 196–97, 205–06). At that time, the district court asked whether Olin would take Seymour back, and we conclude that Olin's response was equivocal at best. Counsel for Seymour indicated some surprise that Olin had even mentioned reinstatement, stating that this was the first time they had expressed even remote interest in the subject. (Record, vol. VI at 198). The following day, immediately prior to closing arguments, counsel for Olin again mentioned that the court could not order prospective damages unless it was not reasonable to award reinstatement. (Record, vol. VII at 7).

The failure of counsel for Olin to put either the court or Seymour on notice that Olin was opposed to an award of prospective damages prior to the charge conference allowed the parties and the court to try the case without being aware of the possibility that reinstatement might be an issue in the case. In view of this failure and of the

impracticality of ordering reinstatement in this case, we conclude that the district court did not abuse its discretion in submitting to the jury the issue of prospective damages.

## V. APPORTIONMENT OF DAMAGES.

[10] The district court charged the jury to assess all of the damages for loss of income incurred by Seymour against Olin if it found for Seymour on both the fair representation and wrongful discharge claims. The court held the Union responsible for the attorney's fees reasonably due to counsel for Seymour. Olin argues that this division of damages was improper. Relying on *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), for the proposition that in § 301 suits, damages should be apportioned between the company and the union according to the fault of each, Olin urges that, at most, it is responsible only for those damages that accrued prior to the time that an arbitrator would have issued an award had the grievance process been followed. Any subsequent damages, the company argues, should have been charged against the Union. We conclude, however, that *Vaca v. Sipes* and its progeny do not limit Olin's liability for the damages flowing from the wrongful discharge in the manner that Olin suggests, and that the district court properly apportioned damages between the defendants.[8]

In *Vaca v. Sipes, supra,* the Supreme Court set forth the basic guidelines for apportioning damages in suits charging a union with a breach of the duty of fair representation and an employer with an underlying wrongful discharge. In *Vaca*, the trial court awarded the employee both compensatory damages for lost wages and punitive damages against the union. In holding that

---

**8.** The district court notes in its post-trial order that all parties made an oral stipulation that the court would determine damages recoverable against the Union, based on the attorney's fees due to counsel for Seymour, and that the jury would award damages only against Olin. (Record, vol. II at 480). It is clear from the position taken by the Union at trial with respect to the evidence relating to damages that it was operating under the assumption that the jury would not decide the damage issue against

the Union. (Record, vol. IV at 89–90). However, counsel for Olin requested that the jury be instructed on the issue of apportionment, objected to the failure of the court so to charge the jury, and noted an objection during the trial to the Union's position that all damages except attorney's fees and costs would be assessed against Olin alone. Because the record does not convince us that Olin was a party to the alleged stipulation, we must address the merits of Olin's argument.

the union was not liable for lost wages, the Supreme Court addressed the issue of apportionment of damages:

> [W]hat portion of the employee's damages may be charged to the union: in particular, may an award against a union include, as it did here, damages attributable solely to the employer's breach of contract? We think not. Though the union has violated a statutory duty in failing to press the grievance, it is the employer's unrelated breach of contract which triggered the controversy and which caused this portion of the employee's damages. The employee should have no difficulty recovering these damages from the employer, who cannot, as we have explained, hide behind the union's wrongful failure to act.

386 U.S. at 196–97, 87 S.Ct. at 919–20. The Court then announced the general rule and applied it to the facts of that case:

> The governing principle, then, is to apportion liability between the employer and the union according to the damage caused by the fault of each. Thus, damages attributable solely to the employer's breach of contract should not be charged to the union, but increases if any in those damages caused by the union's refusal to process the grievance should not be charged to the employer. In this case, even if the Union had breached its duty, all or almost all of [the employee's] damages would still be attributable to his allegedly wrongful discharge by [the employer].

386 U.S. at 197–98, 87 S.Ct. at 920–21.

■ A comparison of the facts of *Vaca v. Sipes* and this case demonstrates that the decision of the district court here not to assess damages for Seymour's loss of income against the union is fully consistent with the holding of *Vaca*. In *Vaca*, the employee was discharged on January 8, 1960, and the union processed the employee's grievance through four of the five steps called for in the collective bargaining agreement. In early February, 1961, the union refused to take the grievance to arbi-

tration, the fifth and final step, and the employee filed suit. The case was not tried until June 1964. Under the theory that Olin advances here, the union in *Vaca* would have been liable for back pay beginning at the time that an arbitrator would have issued an award had the union not breached its duty of fair representation, most likely sometime in 1961. However, the Supreme Court clearly held that even assuming that the union had breached its duty of fair representation, the union's share of the employee's damages was *de minimus*. *Id.* at 198, 87 S.Ct. at 921. Likewise, in the instant case, it is probable that an arbitrator would have made an award in less time than the two years and one month that elapsed between Seymour's discharge and the instant trial. Nonetheless, the company, not the Union, is responsible for the wrongful discharge and for the damages that flow from it. Like the Supreme Court in *Vaca*, "we see no merit in requiring the union to pay the employer's share of the damages." *Id.* at 197, 87 S.Ct. at 920.

The district court's apportionment of damages in the instant case receives further support from cases that interpret the *Vaca* rule. In *Czosek v. O'Mara*, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970), the Court specifically addressed the issue of what measure of damages should be applied when a union which breaches its duty of fair representation but played no part in the underlying wrongful discharge. The Court stated:

> Assuming a wrongful discharge by the employer independent of any discriminatory conduct by the union and a subsequent discriminatory refusal by the union to process grievances based on the discharge, damages against the union for loss of employment are unrecoverable except to the extent that its refusal to handle the grievances added to the difficulty and expense of collecting from the employer.

397 U.S. at 29, 90 S.Ct. at 773.[9] Since the award of attorney's fees and costs against

**9.** Although *Czosek* involved a suit under the   Railway Labor Act, it is an application of the

the Union is a fair measure of the "difficulty and expense of collecting" from Olin, and since there was no claim that the Union participated in the discharge of Seymour in any way, the district court's handling of the apportionment of damages in this case was proper under *Czosek*.

Decisions in other circuits also support the result in this case.[10] The Fourth Circuit has declined to hold a union liable for lost wages caused by an employer's wrongful discharge of an employee where the union had no role in the wrongful discharge. *See Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888 (4th Cir. 1980); *Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61*, 620 F.2d 439 (4th Cir. 1980).[11] In *Bowen v. United States Postal Service*, 642 F.2d 79 (4th Cir. 1981), the court reviewed a district court judgment that had apportioned damages between an employer and a union on the same theory that Olin presses here, charging the company with the portion of the damages which accrued prior to the time the employee could have been reinstated had the union

pressed the grievance, and charging the union with the damages accruing thereafter. The court of appeals reversed, holding that no portion of the award for lost compensation was chargeable to the union. *Id.* at 82.

The Sixth Circuit has reached a similar conclusion. In *Milstead v. International Brotherhood of Teamsters*, 580 F.2d 232, 236 (6th Cir. 1980), the court vacated a damage award against a union in a § 301 suit because it was possible that the jury had included some damages for lost wages in its verdict. On appeal after remand, the court held that evidence of lost wages could not be introduced against the union, since the union was not liable for lost wages. *Milstead v. International Brotherhood of Teamsters*, 649 F.2d 395, 396 (6th Cir. 1981).[12]

We are satisfied that this line of authority reflects a sound policy. We see no reason why Olin should be relieved of the natural consequences flowing from its wrongful discharge of Seymour, merely because the Union defaulted in its separate duty to Seymour promptly to rectify Olin's

---

*Vaca v. Sipes* apportionment rule. Similar reasoning governs in both instances. *See Electrical Workers v. Foust*, 442 U.S. 42, 50, 99 S.Ct. 2121, 2127, 60 L.Ed.2d 698 (1979).

**10.** We acknowledge that there is dicta in two First Circuit cases which might seem to support Olin's position. *See de Arroyo v. Sindacato de Trabajadores Packinghouse, AFL–CIO*, 425 F.2d at 289–90; *Soto Segarra v. Sea-Land Service, Inc.*, 581 F.2d at 298. However, we do not read the holdings of these cases as inconsistent with the result in this case. In *Soto Seggara*, for example, a period of almost ten years elapsed between the discharge and the appeal in the case. Although arbitration would have almost certainly produced an award in less time, the First Circuit held that the union was not liable for any lost wages. 581 F.2d at 298. Similarly, the court did not hold the union liable for any part of the back pay award in *de Arroyo*, but held the company liable for the full amount. 581 F.2d at 289–90.

**11.** In *Harrison v. United Transportation Union*, 530 F.2d 558 (4th Cir. 1975), *cert. denied*, 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), the court held a union liable for lost wages where the deliberately misleading conduct of the union caused the employee to lose any right of action he had under the Railway Labor Act against the company. This decision has not been applied, however, to hold unions liable for

back pay in cases where the union's conduct itself has not foreclosed all recourse against the employer. *See Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d at 892–93 (union is not liable for back pay where employee is foreclosed from recovering against company by his dismissal of claim against company at trial); *Self v. Drivers, Chauffeurs, Warehousemen and Helpers Local Union No. 61*, 620 F.2d at 444 (union is not liable where damages are not attributable to its misconduct).

**12.** Appellant Olin relies heavily on the opinion of the district court in *Ruzicka v. General Motors Corp.*, 96 L.R.R.M. 2822 (E.D.Mich.1977). There, the district court held that there had been both a wrongful discharge and a breach of the duty of fair representation, and the court apportioned its award of compensatory damages equally between the union and the employer. We note that this opinion was recently vacated on other grounds. *Ruzicka v. General Motors Corp.*, 649 F.2d 1207 (6th Cir. 1981). Moreover, the holding of the *Ruzicka* district court on the issue of apportionment of damages is inconsistent with the above-mentioned Sixth Circuit opinions as well as the express requirement of *Vaca v. Sipes* that liability be apportioned according to the fault of each party.

wrong. The weakness of Olin's position is revealed when it is expressed somewhat more starkly: Olin, the wrongdoer, protests to the Union: you should be liable for all damages flowing from my wrong from and after a certain time, because you should have caught and rectified my wrong by that time.

The rule we adopt is also consistent with the policy concerns noted in a different context by the Supreme Court in *Electrical Workers v. Foust*, 442 U.S. 42, 50, 99 S.Ct. 2121, 2127, 60 L.Ed.2d 698 (1979): "This limitation on union liability thus reflects an attempt to afford individual employees redress for injuries caused by union misconduct without compromising the collective interests of union members in protecting limited funds."[13] Similar concerns were also voiced in *Vaca v. Sipes*, 386 U.S. at 197, 87 S.Ct. at 920.

The most important policy reason favoring the award of damages for lost wages against the Union is the need for some incentive to ensure that unions will diligently pursue their duty of fair representation. We believe that awards of attorney's fees and costs, which will often be substantial as in the instant case, provide an appropriate incentive.[14]

## VI. EXCESSIVENESS OF DAMAGES AGAINST THE UNION.

■ The district court awarded $39,-368.75 in attorney's fees against the Union.

At a hearing conducted after the jury had returned its verdict, Seymour's attorney introduced evidence that he had performed 423.75 hours of out-of-court work and 25 hours in court in connection with this case. Seymour's attorney produced two expert witnesses, one of whom testified that a reasonable attorney's fee would be $60,000 and the other set $50,000 as a fair award. The Union did not produce any expert witnesses of its own, but merely cross-examined Seymour's experts.

The Union now contends that the district court's award of attorney's fees was excessive as a matter of law. The Union argues that "by no stretch of the imagination" could a lawyer spend so much time on this case, but it introduced no evidence at the hearing to support this contention.

When reviewing awards of attorney's fees, this court "will not disturb an award unless there is a clear showing that the [award] is excessive as a matter of law." *Anderson v. Eagle Motor Lines, Inc.*, 423 F.2d 81, 85 (5th Cir. 1970), *quoted with approval in Del Casal v. Eastern Airlines, Inc.*, 634 F.2d 295, 302 (5th Cir. 1981), *cert. denied*, 452 U.S. 903, 101 S.Ct. 3027, 69 L.Ed.2d 403 (1981) (award of $35,000 in connection with claim of breach of duty of fair representation is not excessive). The Union made no showing in this case that the award was excessive. The district court

---

**13.** We do not read *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976), as pointing to a contrary result. In *Hines*, employees had been discharged for alleged dishonesty. The union represented the employees in arbitration proceedings which the company won. The employees filed a suit under § 301, claiming that the charges of dishonesty were false and that the union could have discovered this if it had investigated the matter. The Court held that the suit could be maintained against both the company and the union despite the finality of the arbitration proceeding, and that the employees "are entitled to an *appropriate remedy* against the employer as well as the union." 424 U.S. at 572, 96 S.Ct. at 1060 (emphasis added).

In his concurrence, Justice Stewart argued that the company could not be held liable for wage loss beyond the allegedly tainted arbitration proceedings. We note that no other mem-

bers of the Court joined in Justice Stewart's suggestion. In addition, we note that the instant case is distinguishable from the facts of *Hines* before Justice Stewart; in this case there was no final arbitration decision on which the company could have justifiably relied.

**14.** We emphasize that our holding that only the company is liable for damages flowing directly from the wrongful discharge is limited to cases where there is no evidence that the union participated in or contributed to the wrongful discharge and where there is no evidence that the union covered up exculpatory evidence or otherwise prevented the company from ascertaining the true facts. We hold only that the company is not relieved of responsibility and cannot shift that responsibility to the union merely because the grievance procedures might have remedied the company's wrong sooner.

expressly and carefully considered the factors outlined in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), for awarding attorney's fees. Therefore, we must reject the suggestion that the award of attorney's fees in this case was improper or excessive.

## VII. JURY INSTRUCTIONS.

■ Appellants claim that the charge to the jury was erroneous in several respects. Both the Union and Olin argue that the instruction was confusing to the jury in that one portion implied that the Union had an absolute duty to file a grievance for Seymour. The jury was charged that the Union must "follow the grievance procedures set out in the contract." (Record, vol. VII at 134). However, the court corrected any possible ambiguity on this point later in the jury instruction, charging that the Union may make a good faith decision not to file a grievance, and that it is not required to satisfy completely every employee with a grievance.[15] We believe that a fair reading of the jury instructions as a whole indicates that the jury was not misled to believe that a union may be held liable for a breach of the duty of fair representation every time it fails to file a grievance at the request of an employee. Therefore, the fact that the instructions arguably contain some technical imperfection does not taint the instructions since the charge as a whole was not misleading. *See Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 300 (5th Cir. 1978); *Hous-*

*ton v. Herring*, 562 F.2d 347, 348–49 (5th Cir. 1977).

In addition, we believe that the portion of the charge to which appellants object is not inconsistent with the remainder of the charge. The grievance procedures outlined in the collective bargaining agreement, which had been admitted into evidence, do not suggest that it is mandatory that the Union pursue each and every grievance. The procedures indicate that the Union *may* appeal company decisions on grievances if the Union finds them unacceptable. Collective Bargaining Agreement at 10. This contract language in no way implies that the Union is obliged to press all grievances. Since we find that the charge was not ambiguous in this regard and that even if ambiguity existed it was cured by the remainder of the instruction, we reject appellants' argument that the jury instructions would lead the jury to believe that the Union was under a duty to press each and every grievance claimed by an employee.

We find no merit in the other challenges to the jury instructions raised by defendant Olin.

## VIII. CONCLUSION.

The district court did not err in refusing to direct a verdict for defendants Olin Corporation and United Steelworkers of America, since the view of the evidence most favorable to the plaintiff indicates that the Union refused to process Seymour's griev-

---

**15.** The jury instructions on this point provided in relevant part:

> If a grievance arose between an employee and Olin, the employee had a right to ask the union to resolve the grievance with Olin and the union had a duty to act fairly and reasonably to investigate the matter and to follow the grievance procedures set out in the contract. This is called the duty of fair representation.
>
> Plaintiff John D. Seymour has alleged that the defendant United Steelworkers of America, AFL–CIO–CLC, Local 8018, breached this duty of fair representation when it failed to carry his discharge through the contract grievance procedures leading to arbitration.
>
> \* \* \* \* \* \*
>
> Now, the union is not liable to one of its members for failing to file, process or arbi-

trate that member's grievance except where the union's conduct towards that member has been arbitrary, discriminatory or in bad faith.

> No employee has an absolute right to have his grievance processed or arbitrated, and each and every grievance is subject to the union's good faith decision not to file.
>
> The union is not required to completely satisfy any employee for whom it is a collective bargaining representative in order to fulfill its duty of fair representation, but the union has an obligation to serve the employees whom it represents reasonably.
>
> If the union's conduct in representing employees is in good faith, is not discriminatory and is not arbitrary, it is considered to be reasonable.

(Record, vol. VII at 134; 135–36).

ance unless he fired his attorney. Since such conduct is arbitrary and therefore constitutes a breach of the duty of fair representation, the district court properly submitted the case to the jury. The district court did not commit error in awarding prospective damages or in apportioning damages between the defendants. The other claims of error advanced by the defendants are also without merit, and therefore the judgment of the district court is

AFFIRMED.

* Former Fifth Circuit case, Section 9(1) of Public   Law 96–452—October 14, 1980.