99 F.3d 1140
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
David J. SPARKS, Plaintiff-Appellee/Cross-Appellant,
v.
INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, &
AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW,
Defendant-Appellant/Cross-Appellee,
UAW Staff Council, Defendant-Appellee.
 No. 94-3951, 94-3953, 94-4004.
 United States Court of Appeals, Sixth Circuit.
 Aug. 26, 1996.
 
 Before: NORRIS and COLE, Circuit Judges; HULL, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff David Sparks filed a Section 301 hybrid claim[1] against his employer, the International Union, United Auto, Aerospace & Agricultural Implement Workers of America (the "UAW"), and his union, the Staff Council of International Representatives of UAW (the "Staff Council") after he was dismissed from his position as an international representative of the UAW in the Cleveland area. After the parties agreed to trial before a magistrate judge, a jury returned a verdict in favor of Sparks against the UAW for $499,781.45 and for $2,511.46 against the Staff Council.
 
 I.
 
 2
 This case comes to us with a long history, including a previous appeal to this court. Sparks v. Int'l Union, UAW, 980 F.2d 394 (6th Cir.1992). As a consequence, the following factual recitation is limited to those points that bear upon the issues raised by this appeal.
 
 
 3
 Sparks began working as a UAW International representative in 1962. Throughout his employment, the Staff Council served as his union and negotiated a collective bargaining agreement ("CBA") with the UAW.
 
 
 4
 The key events leading to this dispute occurred in the early 1980s. At that time, Bill Casstevens was the regional director in the Cleveland area and acted as Sparks's supervisor.
 
 
 5
 The first disciplinary action taken against Sparks occurred in 1981 when he was given a two-week suspension, or disciplinary layoff. The Staff Council filed a grievance in response. While that action was pending, Sparks initiated a libel action in the Ohio state courts.[2] Depositions taken pursuant to that suit played a role in Sparks's subsequent termination.
 
 
 6
 After consulting UAW president Douglas Fraser, Casstevens dismissed Sparks on May 17, 1983.[3] In reaching his decision, Casstevens relied upon what the parties refer to as the "89 documents," which included depositions from the libel action. Among other things, co-worker Gary Brandt testified during his deposition that Sparks had threatened to kill then-assistant director Warren Davis. John Hunter, a local president, testified that Sparks had been circulating phoney "FBI documents" to discredit Davis.
 
 
 7
 Sparks responded to his dismissal by requesting that a grievance be filed. Roy Goforth handled the matter for the Staff Council, scheduling a meeting with Casstevens that Sparks did not attend due to illness. However, after Casstevens showed Goforth the 89 documents, the grievance was withdrawn without Sparks's approval.
 
 
 8
 The Staff Council sought to resubmit the grievance but the UAW refused.[4] A § 301 hybrid claim ensued. The trial court ordered the parties to arbitrate the issue of whether the grievance could be resubmitted. The arbitrator ruled that the grievance could not be resubmitted.
 
 
 9
 After that adverse ruling, Sparks filed a second hybrid action that sought to vacate the arbitration award. Although the trial court granted summary judgment to defendants, this court reversed, holding that "if a member's union breaches its duty of 'fair representation' in representing him in statutorily condoned exclusive grievance procedures, the member is relieved of the usual requirement that he abide by the result of such procedures. He may relitigate in federal court his claims against both his employer and his union." 980 F.2d at 399 (footnote omitted).
 
 
 10
 The case eventually came to trial in November 1993 and, as previously mentioned, the jury returned a verdict for plaintiff.
 
 
 11
 The UAW filed post-trial motions for judgment as a matter of law, a new trial, and remittitur. While denying the motions for judgment as a matter of law and for a new trial, the magistrate judge partially granted the motion for remittitur by directing plaintiff either to accept a remittitur of $125,533.98 or to face a new trial. Sparks accepted the remittitur. The trial court also awarded pre-judgment interest and costs but denied plaintiff's request for attorney's fees.
 
 
 12
 The court entered final judgment on August 26, 1994, against the UAW in the amount of $374,247.47, plus pre-judgment interest of $105,722.28, and a prospective pension of $1,418.25 per month. The amount assessed against the Staff Council remained $2,511.46.
 
 II.
 1. Just Cause for Dismissal
 
 13
 Sparks's claim against the UAW was based upon his contention that he had been terminated without just cause, in violation of the CBA. The UAW argued that the CBA did not include a just cause limitation and that even if it did, just cause existed for Sparks's termination. The trial court concluded that the language of the CBA was ambiguous on the issue of just cause, and submitted to the jury the question of whether the CBA included a just cause limitation. The jury found that it did and that the UAW had violated the limitation. Accordingly, on appeal we first are asked to determine whether the CBA requires just cause for termination. As a question of law, we review de novo the trial court's construction of the CBA. Linton v. United Parcel Serv., 15 F.3d 1365, 1370 (6th Cir.1994). Assuming that the first question is answered in the affirmative, we are then asked to decide whether the UAW had just cause to fire Sparks from his position as an international representative.
 
 
 14
 a. Did the CBA require just cause?
 
 
 15
 We begin our discussion here by acknowledging that strong arguments exist on both sides of this issue. The CBA does not contain an explicit just cause provision; rather, it provides that an arbitrator shall have authority to render binding decisions on "[c]laims of unjust discharge or disciplinary action." It was this language that convinced the trial court that the CBA was, at the very least, ambiguous and therefore an appropriate issue for a jury to determine. See Parrett v. American Ship Bldg. Co., 990 F.2d 854, 858 (6th Cir.1993) (noting that once language of written agreement is deemed ambiguous, its interpretation becomes a factual issue for jury).
 
 
 16
 In reviewing that decision, we adopt the framework provided by International Union, UAW v. Yard-Man, Inc., 716 F.2d 1476 (6th Cir.1983), cert. denied, 465 U.S. 1007 (1984), which illustrates the sometimes conflicting policies that render construction of a CBA particularly difficult:
 
 
 17
 Many of the basic principles of contractual interpretation are fully appropriate for discerning the parties' intent in collective bargaining agreements. For example, the court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent. The intended meaning of even the most explicit language can, of course, only be understood in light of the context which gave rise to its inclusion. The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance.... Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy. This is not to say that the collective bargaining agreement should be construed to affirmatively promote any particular policy but rather that the interpretation rendered not denigrate or contradict basic principles of federal labor law.
 
 
 18
 Id. at 1479-80 (citations omitted).
 
 
 19
 Not surprisingly, the UAW contends that the trial court's finding of ambiguity placed insufficient value upon the Yard-Man directive to reconcile the interpretation "with federal labor policy." In the UAW's view, federal labor policy includes the right to discharge staff for political incompatibility. See, e.g., Finnegan v. Leu, 456 U.S. 431, 440-41 (1982); Tucker v. Bieber, 900 F.2d 973, 978 (6th Cir.), cert. denied, 498 U.S. 848 (1990). However, while these cases have some persuasive force, they are not controlling because they do not involve the construction of a CBA and also concern a different federal statute, the Labor-Management Reporting and Disclosure Act of 1969, 29 U.S.C. §§ 401-531, from the one at issue here.
 
 
 20
 Rather, as Yard-Man instructs, we begin with the language of the agreement itself and turn to extrinsic evidence of intent and federal labor policy only if our initial inquiry proves inconclusive. Article IX(B)(1), which empowers an arbitrator to render binding decisions on claims of unjust discharge, would appear to make sense only if the CBA requires termination for just cause. If, as the UAW seems to suggest, the CBA contemplates at-will employment, then there would seem to be no reason to submit a claim of "unjust discharge" to arbitration. A contract should not be construed in a manner that renders an explicit provision meaningless when another reading harmonizes the entire instrument. Yard-Man, 716 F.2d at 1480.
 
 
 21
 Such a reading of the CBA is not at odds with federal labor policy. It would be ironic indeed if a CBA negotiated by a union employer that included language concerning "unjust discharge" was construed in such a hyper-technical manner that "unjust discharge" were not regarded as the linguistic equivalent of "just cause," since one would not expect a labor union to argue that courts should adopt a narrow focus that favors construing employment contracts as at-will relationships.
 
 
 22
 While courts have recognized that union policy-making posts are analogous to traditional political appointments,[5] that does not mean that the position of a union employee cannot be protected by a CBA containing a just cause provision. The trial court here denied the UAW's motion for a new trial because it concluded that a jury could have found that Sparks's dismissal was not necessarily for political incompatibility but may have been based on incidents of a personal nature that did not amount to just cause.
 
 
 23
 Although we are inclined to conclude that the trial court erred in its view that the CBA was ambiguous on the matter of just cause termination, any error in submitting to the jury the question of whether the CBA included a just cause limitation would be harmless, since the jury's determination of that issue accords with our view that the CBA's language contemplates a just cause termination standard.
 
 
 24
 b. Did just cause exist?
 
 
 25
 Furthermore, we agree with the rationale advanced by the trial court when it determined that legally sufficient evidence existed to support the jury's finding that the UAW lacked just cause in terminating Sparks. The appropriateness of this determination is particularly clear when considered in the context of our standard of review. Like the trial court, in reviewing a denial of a motion for judgment as a matter of law, we are mindful that the motion should be granted only "when the evidence weighs so heavily in favor of the movant that reasonable minds could not come to a different conclusion." Miller's Bottled Gas, Inc. v. Borg-Warner Corp., 56 F.3d 726, 734 (6th Cir.1995). The trial court's Memorandum and Opinion of June 29, 1994, fully sets out the factual bases that support the jury's verdict, see Mem.Op. at 9-19, and we will not restate them here. We affirm on this issue.
 
 2. Apportionment of Damages
 
 26
 The UAW also takes issue with the instruction given by the trial court concerning the apportionment of damages between it and the Staff Council. The court gave the following instruction:
 
 
 27
 You should apportion any award of damages between the employer and the union according to the damages caused by the fault of each. The employer is responsible for damages caused solely by its breach of the contract. The union is responsible for any increase in damages resulting from the violation of its duty of fair representation.
 
 
 28
 Generally an employer may rely on a union's withdrawal of a grievance as a determination that the grievance is without merit. Thus, the UAW was entitled to rely on the August 8 [1983] withdrawal of the grievance as a final disposition of that grievance. Furthermore, the UAW did not act contrary to its contractual obligations in refusing to process the August 10, 1983 grievance filed after the withdrawal of the August 8 grievance.
 
 
 29
 If you find, however, that subsequent to its violation of the duty of fair representation, Staff Council brought to the UAW's attention that Staff Council may have committed a breach of that duty when withdrawing the grievance, you may take that notification into consideration when determining the manner in which you apportion damages.
 
 
 30
 The UAW relies primarily upon Bowen v. United States Postal Serv., 459 U.S. 212 (1983), for the proposition that damages should be calculated in a chronological manner; in other words, an employer becomes liable for damages only when it becomes aware that the union breached its duty of fair representation. In discussing this interplay in the context of a § 301 hybrid suit, Justice Powell reasoned:
 
 
 31
 By seeking and acquiring the exclusive right and power to speak for a group of employees, the union assumes a corresponding duty to discharge that responsibility faithfully--a duty which it owes to the employees whom it represents and on which the employer with whom it bargains may rely. When the union, as the exclusive agent of the employee, waives arbitration or fails to seek review of an adverse decision, the employer should be in substantially the same position as if the employee had had the right to act on his own behalf and had done so.
 
 
 32
 Bowen, 459 U.S. at 226.
 
 
 33
 In our view, the UAW reads Bowen too expansively. That opinion includes no firm statement regarding a chronological approach to the apportionment of damages.[6] Rather, a footnote to the opinion supports the jury instruction given by the trial court: "The union would have the option, if it realized it had committed an arguable breach of duty, to bring its default to the employer's attention. Our holding today would not prevent a jury from taking such action into account." Id. at 226 n. 15.
 
 
 34
 We review jury instructions as a whole, only reversing when they are confusing, misleading, or prejudicial. Beard v. Norwegian Caribbean Lines, 900 F.2d 71, 72-73 (6th Cir.1990). While the UAW points to conflicting testimony concerning precisely when the Staff Council acknowledged its breach and thus shifted liability for damages to the UAW, the resolution of such fact-specific questions are precisely the province of a properly instructed jury. While a chronological apportionment of damages is one appropriate approach to the resolution of this issue, it is by no means the only legitimate one. Neither Bowen nor any case from this court holds to the contrary. Accordingly, we discern no error in either the jury instruction or the manner in which damages were apportioned.
 
 3. Calculation of Damages
 
 35
 As mentioned above, Sparks accepted the trial court's decision that the UAW was entitled to a remittitur of $125,533.98. On appeal the UAW contends that the court miscalculated the amount. We review the decision to grant a motion for remittitur for abuse of discretion. Roush v. KFC Nat'l Management Co., 10 F.3d 392, 397 (6th Cir.1993), cert. denied, 115 S.Ct. 56 (1994).
 
 
 36
 Having carefully reviewed the various claims of error raised by the UAW and having had the benefit of oral argument, we now affirm the trial court's decision for the reasons outlined in its Memorandum and Opinion of June 29, 1994. See Mem.Op. at 33-37.
 
 4. Misconduct by Plaintiff's Counsel
 
 37
 During the trial, counsel for plaintiff asked improper questions to which the court responded forcefully by giving a curative instruction and then questioning each juror in chambers. Nonetheless, the UAW sought a new trial because of the potential prejudice caused by counsel's misconduct.
 
 
 38
 As the trial court correctly observed in denying the motion for a new trial, a verdict should be set aside when a reasonable probability exists that counsel's improper behavior unduly influenced the jury. Davis v. Mutual Life Ins. Co. of New York, 6 F.3d 367, 387 (6th Cir.1993), cert. denied, 510 U.S. 1193 (1994). We accord considerable deference to the judgment of the trial court on this issue and examine the totality of the circumstances in determining whether a reasonable probability of improper influence occurred. Id.
 
 
 39
 We affirm the denial of a new trial. The court responded immediately to the improper questions posed by counsel and made clear to the jury that they were to be disregarded. Although the UAW argues that the very forcefulness of the trial court's response may have enhanced the importance of the questions in the eyes of the jury, we presume that a jury will understand and adhere to curative instructions. See Holmes v. City of Massillon, 78 F.3d 1041, 1047 (6th Cir.1996) (citing cases).
 
 5. Cross-Appeal
 
 40
 a. Pre-judgment Interest
 
 
 41
 In his cross-appeal Sparks first contends that the trial court should have selected a rate of 10% for pre-judgment interest as authorized by Ohio Rev.Code § 1343.03. Instead, the rate was set at 6.38%, a rate derived from the federal post-judgment rate established by 28 U.S.C. § 1961(a).
 
 
 42
 Although Sparks correctly points out that the court may look to state law in selecting a rate, it need not do so. Rather, the court enjoys discretion in this area. Moreover, reliance on the federal post-judgment rate has been generally approved as valid. See EEOC v. Wooster Brush Co. Employees Relief Ass'n, 727 F.2d 566, 578-79 (6th Cir.1984).
 
 
 43
 b. Attorneys' Fees
 
 
 44
 Finally, we turn to the trial court's decision not to grant plaintiff attorneys' fees. In rendering its decision, the court acknowledged that the award of fees has been approved in cases similar to that now before us. See, e.g., Wilson v. Int'l Bhd. of Teamsters, 83 F.3d 747, 753 (6th Cir.1996) ("[I]n Section 301 cases the damages arising from a union's breach of its duty of fair representation include the attorneys' fees reasonably incurred in pursuing a claim against the employer for breach of the collective bargaining agreement."). However, the court denied fees to plaintiff because it reasoned plaintiff "did not allege that attorney fees were an element of the compensatory damages being sought and did not submit any evidence relating to attorney fees." Thus, "[t]he court does not have authority to assess attorney fees as an element of compensatory damages since that would be a jury issue."
 
 
 45
 Generally, we review the denial of attorneys' fees for abuse of discretion. Black v. Ryder/P.I.E. Nationwide, Inc., 970 F.2d 1461, 1472 (6th Cir.1992). However, in presuming that the question was solely one for the jury, the trial court misapprehended its role in the award of such fees. A successful plaintiff in a § 301 hybrid action may submit the issue to the court, which may then hold an evidentiary hearing as to what, if any, fees are warranted. See, e.g., Seymour v. Olin Corp., 666 F.2d 202, 215 (5th Cir.1982).
 
 
 46
 The trial court erred, therefore, to the extent that it denied attorneys' fees because it believed itself precluded from doing so by the fact that the issue had not been submitted to the jury. Thus, we remand the action to the court with instructions to conduct whatever further proceedings it deems necessary to determine whether a fee award is appropriate.
 
 III.
 
 47
 For the foregoing reasons, the judgment is vacated and the cause remanded for further proceedings on the sole issue of attorneys' fees. On all other issues raised by this appeal, the district court is affirmed.
 
 
 
 *
 The Honorable Thomas G. Hull, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 Section 301 of the National Labor Relations Act (the "NLRA"), 29 U.S.C. § 185, permits an employee to sue his employer and union by alleging that the former breached its collective bargaining agreement and the latter breached its duty of fair representation
 
 
 [2]
 Summary judgment was ultimately rendered in favor of defendants
 
 
 [3]
 The letter of dismissal read: "Your attitude and actions over the past several years made you totally incompatible for continued employment with the UAW."
 
 
 [4]
 Apparently, the Staff Council recognized that Goforth had made an error in withdrawing the grievance so quickly. Darryl Greer, chairman of the Staff Council, became personally involved with the effort to have the grievance reinstated. In its answer to plaintiff's original hybrid suit, the Staff Council admitted a breach of the duty of fair representation
 
 
 [5]
 For instance, Justice Blackmun's concurrence in Finnegan invokes Elrod v. Burns, 427 U.S. 347 (1976), for the proposition that "the newly elected [union] president may discharge the union's appointed business agents and other appointed union member-employees who will be instrumental in evolving the president's administrative policies." Finnegan, 456 U.S. at 442-43
 
 
 [6]
 The Tenth Circuit has explicitly stated, "Bowen does not require the application of a chronological method of apportionment based on a hypothetical arbitration date." Aguinaga v. United Food and Commercial Workers Int'l Union, 993 F.2d 1463, 1476 (10th Cir.1993), cert. denied, 114 S.Ct. 880 (1994)