**Miguel GARCIA, Plaintiff–Appellant,**

v.

**ZENITH ELECTRONICS CORPORATION and Local 1031, International Brotherhood of Electrical Workers, AFL–CIO, Defendants–Appellees.**

No. 94–3137.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 12, 1995.

Decided June 28, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied
July 27, 1995.

Robert F. Lisco (argued), Chicago, IL, for plaintiff-appellant.

John L. Collins, John T. Murray (argued), Theodore C. Stamatakos, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Zenith Electronics Corp.

Marvin Gittler, Susan Brannigan (argued), Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, for Local 1031, Intern. Broth. of Elec. Workers, AFL–CIO.

Before CUDAHY, ESCHBACH and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Miguel Garcia, a former employee of Zenith Electronics Corporation (Zenith) and a member of the International Brotherhood of Electrical Workers, Local 1031 (the Union), appeals the dismissal of his claim of breach of duty of fair representation against the Union. We affirm.

## I. FACTS

In October, 1991, someone put two anonymous letters under the door of an administrative office in Zenith's Melrose Park, Illinois facility. The first letter accused a "Rico V." of theft and an "Art L." of incompetence, and threatened sabotage if both were not fired. R.O.A. 5, Exh. 1. The second letter again threatened sabotage, demanding to know why "Art Lemmon" was a plant engineer and giving the company two weeks to fire Lemmon to avoid sabotage. The letter warned "[r]emember the oil in the Di water system about 4 months ago," and threatened that "this time it will be worse." R.O.A. 5, Exh. 2. The person delivering the letters was caught on a video surveillance camera videotape, but the image was blurry and

difficult to identify. Nevertheless, the Zenith officials viewing the tape suspected that the person depicted was Garcia. Garcia had worked for Zenith for nearly 25 years, held the position of master maintenance mechanic and was a member of the Union.

When Zenith initially contacted Garcia about the letters, he first stated that he knew about the letters but had not written or distributed them. Shortly thereafter, however, he signed a statement in which he denied writing the letters but did admit to finding them on the floor by the offices, reading them and sliding them under the door. He also admitted to disliking Art Lemmon and stated that "Art bothers people day and night." R.O.A. 5, Exh. 4. Garcia provided yet another version of the story in his deposition testimony in the district court, contending there that he merely saw the letters on the floor, read them, and then left them on the floor rather than sliding them under the door. Mem.Op. at 3. Garcia now claims that he saw the letters but did not slip them under the door and that he did not understand the initial statement when he signed it. He also contends that he was not the person shown on the videotape slipping the notes under the door, although he does admit that he picked up the notes and read them. Nevertheless, Zenith concluded that Garcia had both written and delivered the letters and fired him for his actions.

The Union had a collective bargaining agreement with Zenith which provided for a three-step grievance procedure. When Garcia was fired, the Union immediately filed a grievance on Garcia's behalf in accordance with this agreement. The Union then pursued the grievance through the established three-step grievance process and on to arbitration, demanding reinstatement with no loss of seniority or wages. The Union also hired Richard M. Stanton (Stanton), a private labor law attorney, to represent Garcia at the arbitration.

Garcia says that he first met Stanton on the morning of the arbitration hearing. He further alleges that Stanton told Garcia not to testify on his own behalf, and that Stanton did not interview or call to the stand a Mr. Khalil Khalil, a coworker who Garcia claims could corroborate Garcia's story. Garcia also complains of Stanton's alleged failure to review the videotape himself [1] and his alleged perfunctory handling of the hearing. Finally, Garcia alleges that he told Chief Union Steward Donald Haynes and Union Business Representatives Jose Caez and Roy Cortes that he wished to speak to his own attorney, and that they all told him that it was against Illinois law for him to have his own attorney. The Union representatives deny ever making this statement.

The arbitrator upheld Garcia's termination. Garcia then brought this case before the district court alleging that the Union had breached its duty of fair representation. The district court granted the Union's motion for summary judgment, and Garcia appeals.

## II. DISCUSSION

A union has broad authority as the exclusive bargaining agent for a class of employees. This authority stems from the employees' choice to exercise their right to self organization. By pooling economic strength employees are able to achieve improvements in conditions of employment. *See, e.g., NLRB v. Allis–Chalmers Mfg. Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967). The union represents all the employees as a unit acting by majority vote, but each individual employee in the unit is a beneficiary of this collective action.

Thus, these employee benefits are a result of collective action, of which majority

1. Donald Haynes, the chief steward for the Union, testified that he saw the tape, that the man on the tape looked like Garcia (although he admitted it wasn't clear) and that Garcia had admitted to him that he was the man on the tape. Stanton also testified that Garcia admitted to him that he was the man on the tape. Garcia denies admitting to anyone that he was on the tape. (We note that the attorney-client privilege is generally waived when the client asserts claims or defenses that put his attorney's advice at issue in the litigation. *See, e.g., Rhone–Poulenc Rorer Inc. v. Home Indemnity Co.,* 32 F.3d 851 (3rd Cir.1994). Therefore, even if the parties had raised the issue of attorney-client privilege, which they did not, it would not be a problem in this case.)

rule is an important characteristic. *See Allis–Chalmers Mfg. Co.,* 388 U.S. at 180, 87 S.Ct. at 2006. The interests of individual employees sometimes may be compromised for the sake of the larger bargaining collective. *See Allis–Chalmers Mfg. Co.,* 388 U.S. at 180, 87 S.Ct. at 2006 ("power [is] vested in the chosen representative to act in the interests of all employees," and "the complete satisfaction of all who are represented is hardly to be expected"). Therefore, a "union is accorded considerable discretion in dealing with grievance matters, and it may consider the interests of all its members when deciding whether or not to press the claims of an individual employee." *Seymour v. Olin Corp.,* 666 F.2d 202, 208 (5th Cir.1982). The union may also consider the merits of the case or the effect on the larger collective bargaining unit in making various strategic decisions during the grievance procedure. *See, e.g., Allis–Chalmers Mfg. Co.,* 388 U.S. at 180, 87 S.Ct. at 2006; *Vaca v. Sipes,* 386 U.S. 171, 191, 87 S.Ct. 903, 917, 17 L.Ed.2d 842 (1966); *Griffin v. Air Line Pilots Assoc.,* 32 F.3d 1079, 1083 (7th Cir.1994). The union represents the majority of employees, even while it is representing a single employee in a grievance process. Thus even during an individual grievance procedure, the union's own credibility, its integrity as a bargaining agent and the interests of all its members may be at stake. The union is therefore entitled to enjoy a somewhat different perspective than the individual employee it represents in a grievance matter.

 This broader view has its limits, however. The power the union has to exclusively represent all employees in employment disputes entails "a concomitant duty of fair representation to each of its members." *Cleveland v. Porca Company,* 38 F.3d 289, 295 (7th Cir.1994). The Supreme Court in *Air Line Pilots v. O'Neill,* 499 U.S. 65, 111

S.Ct. 1127, 113 L.Ed.2d 51 (1991), set out a tripartite standard for determining whether this duty has been breached. "A union breaches its duty of fair representation if its actions are either arbitrary, discriminatory, or in bad faith," *Air Line Pilots,* 499 U.S. at 67, 111 S.Ct. at 1130, and the court should look to each standard separately when determining whether a union violated its duty. *Griffin,* 32 F.3d at 1083; *Rakestraw v. United Airlines,* 989 F.2d 944, 945 (7th Cir.1993).[2]

 While arbitrary conduct is a breach of a union's duty, the test for determining whether particular conduct is arbitrary can be quite forgiving. *Trnka v. Local Union No. 688,* 30 F.3d 60, 61 (7th Cir.1994). Courts "should not substitute their judgment for that of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call." *Ooley v. Schwitzer,* 961 F.2d 1293, 1302 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992). Thus, a union's actions are considered arbitrary only if "in light of the factual and legal landscape," these actions are "so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots,* 499 U.S. at 67, 111 S.Ct. at 1130. The union must provide "some minimal investigation of employee grievances," but the thoroughness of this investigation depends on the particular case, and "only an egregious disregard for union members' rights constitutes a breach of the union's duty." *Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1483 (9th Cir.1985). What is required to be shown goes considerably beyond the requirements of a malpractice suit.

 The plaintiff must also establish both that the union acted at least arbitrarily *and* that the plaintiff was actually harmed by the union's actions. *Black v. Ryder,* 15 F.3d 573, 585 (6th Cir.1994); *Ooley,* 961 F.2d at

---

2. In the past this court defined the duty of fair representation very narrowly, requiring the plaintiff to prove that the union conduct was "intentional, invidious, and directed at the employee." *See Hoffman v. Lonza, Inc.,* 658 F.2d 519, 520 (7th Cir.1981) (*but see* Cudahy, J., concurring but espousing a broader view of the duty of fair representation). However, the Supreme Court in *O'Neill,* 499 U.S. at 74–76, 111 S.Ct. at 1133–35, rejected this court's narrow reading of

the duty of fair representation. There the Court stated that the union's actions must not only show "good faith and honesty of purpose," but must also be within a "wide range of reasonableness," which includes "a prohibition against 'arbitrary' conduct." *Id.* at 76, 111 S.Ct. at 1134; *see also Ooley v. Schwitzer,* 961 F.2d 1293, 1302 (7th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992).

1303–04. Failure to "present favorable evidence during the grievance process . . . may constitute a breach of . . . duty only if that evidence probably would have brought about a different decision." *Black,* 15 F.3d at 585. Garcia must therefore establish that the outcome of the arbitration would probably have been different but for the union's activities. *Id.; Ooley,* 961 F.2d at 1304.

■ Garcia attacks five different aspects of the Union's behavior. He claims 1) that Stanton should have presented the testimony of Khalil Khalil, 2) that Stanton should have called Garcia himself to the stand at the arbitration hearing, 3) that Stanton should have reviewed the videotape himself at some point, 4) that Stanton handled the hearing in a perfunctory manner, and 5) that the Union told Garcia that he was legally barred from hiring his own private lawyer. Garcia alleges that all of these deficiencies except the last one were simply arbitrary; the last deficiency, he claims, was an action in bad faith.[3] The district court granted summary judgment in favor of the Union on all these claims, and we review that decision *de novo. Trnka,* 30 F.3d at 61.

## A. Testimony of Khalil Khalil

■ Garcia first complains that Stanton did not interview or present the testimony of his coworker, Khalil Khalil. He argues that Khalil would have testified that Garcia simply found the letters, read them and left them on the floor. He would also have testified that Garcia did not slide the letters under the door and that Khalil and Garcia knew about the surveillance camera and would have known that any suspicious action on their part would be recorded.

Khalil's testimony would have directly contradicted Garcia's signed statement admitting that he slid the letters under the door. The Union's strategy, however, was not to contest the *distribution* of the letters, mainly because of the damning evidence of Garcia's signed statement. Instead, Stanton chose to contest the *preparation* of the letters. He

argued that there was little evidence that Garcia wrote the letters and that termination was a harsh penalty for a 25 year employee with a good record.

While Garcia may disagree with Stanton's strategy, and while another lawyer might have approached the case differently, it is not our job to substitute our judgment for that of the Union, "even if, with the benefit of hindsight, it appears that the union could have made a better call." *Ooley,* 961 F.2d at 1302. We find Stanton's actions here far from irrational, especially given the evidence he had to reconcile. Perhaps the ideal strategy would have been to interview Khalil, but the Union is not held to such a high standard here. We must defer to the Union's strategic choices unless they are irrational, discriminatory or in bad faith, and Stanton's actions were none of the above.

■ Further, even if we were to find Stanton's actions questionable, Garcia has not established that the result would probably have been different had Stanton presented Khalil's testimony. Garcia asserts that Khalil would have testified that Garcia simply found the letters and slid them under the door, thus contesting Zenith's claim that Garcia also wrote the letters. However, the arbitrator specifically noted in his opinion that any further denial by Garcia that he wrote the letters would be highly suspect. Garcia had already contradicted himself by twice denying that he distributed the letters, then signing a statement admitting that he *had* distributed them. Arb.Op. at 6. The arbitrator already doubted Garcia's veracity; we find it hard to believe that further testimony providing a third version of events, and yet another contradiction of Garcia's signed statement and earlier oral statements, would have helped Garcia's cause.

## B. Garcia's Testimony

■ Garcia next contends that Stanton should have allowed Garcia himself to testify. He argues that he would have denied circulating or writing the letters and would have

---

**3.** The district court stated that Garcia did not argue that the Union's actions were either discriminatory or in bad faith. Mem.Op. at 8. However, Garcia did claim in his Response to the Motion for Summary Judgment that he had presented a triable issue of fact as to whether the Union acted in bad faith, R.O.A. 29, p. 14, and briefly argued this point on appeal.

explained that he was confused and uncomprehending when he signed the statement.

Again, Garcia is simply challenging Stanton's strategy. Stanton chose to contest the writing of the letters rather than their distribution. He decided not to put Garcia on the stand because he believed that Garcia would not be a credible witness. Given that Garcia had already contradicted himself, it was reasonable for Stanton to fear that Garcia would not stand up well under cross-examination. Failing to call him to the stand, then, was not an arbitrary act but a strategy decision. While Garcia may disagree with this strategy, it is again not our place to question Stanton's choices on strategy.

 In addition, Garcia has again failed to show that the outcome would probably have been different had he testified. It is certainly possible that the arbitrator would have found Garcia a sympathetic witness and ruled differently, but it is equally possible that Garcia's testimony would have done him more harm than good. As with Khalil's testimony, the arbitrator's doubts about Garcia's credibility suggest that calling Garcia to the stand to refute his signed statement would not have helped his case.

## C. Videotape

 A third breach of the Union's duty of fair representation, Garcia contends, is Stanton's admitted failure to view for himself the videotape from the surveillance camera.[4] Stanton claims that Garcia admitted to him that Garcia was the person shown on the tape. However, Garcia denies making any such statement, and in evaluating a grant of summary judgment, we must view "all of the evidence in the light most favorable to the plaintiff." *Cuddington v. Northern Indiana Public Service Co.*, 33 F.3d 813, 815 (7th Cir.1994).

 The district court found that although Garcia disputed that he was the individual pictured in the videotape, he did not dispute testimony by those who had viewed the videotape that the image was not "crystal clear." Mem.Op. at 18. Further, Garcia

does not allege that viewing the videotape would have allowed Stanton to prove that Garcia was not on the tape.

A conscientious, thorough lawyer would presumably have looked at the videotape and pursued any possible means of vindicating his client. But this action is quite different from a simple malpractice suit. And, under any view, Stanton and the Union are not held to the standard of the ideal lawyer. Stanton must only have acted within "a wide range of reasonableness." *Air Line Pilots*, 499 U.S. at 67, 111 S.Ct. at 1130. Therefore his failure to view the videotape for himself, when even Garcia does not allege that it could clear him of the allegations, does not constitute a breach of the Union's duty of fair representation. Garcia has not established that the failure to view the tape was arbitrary, or that viewing the tape would probably have resulted in a different outcome.

## D. Perfunctory Representation

 Garcia's next allegation, that Stanton's overall handling of the hearing was so perfunctory as to be arbitrary, fails for much the same reason as his videotape claim. Garcia alleges that the Union failed to put on "even a cursory defense," Appellant's Br. at 29, that "Stanton conducted no cross-examination of Zenith's witnesses," *id.* at 24, and that the Union "made no attempt to present his side of the story." Appellant's Reply Br. at 3.

It is undisputed that Stanton rested at the end of Zenith's case and did not call any witnesses of his own. However, Garcia's unsupported claims that Stanton conducted no cross-examination nor said a word in Garcia's defense are hard to believe. The arbitrator's opinion mentions most, if not all, of the Union's arguments. It specifically notes that "the Union argues that an inadequate investigation was conducted by the employer," that the Union suggests that a handwriting expert should have been utilized, that "it is argued further that" the employer had no evidence linking Garcia to sabotage and thus the "penalty does not fit the crime," that the "Union

---

4. Other Union officials had viewed the videotape, and had apparently discussed its contents with Stanton. However, Stanton admits that he himself did not view the tape.

states that" Garcia has an "exemplary work record" and that the Union "reminds the Arbitrator" that Garcia "explained his actions as a effort to alert the employer as to what was happening in the plant." Arb.Op. at 5. The arbitrator also makes specific reference to "the Union counsel's closing argument." *Id.* It is difficult to believe that the arbitrator would be so aware of the Union's case and the details of its arguments had Stanton truly failed to put on "even a cursory defense." Appellant's Br. at 29.

Stanton's strategy and presentation may not have been Garcia's preferred approach, and Stanton may not have been as thorough as he might have been. However, Garcia does not prove a disregard for his case sufficient to meet the standard imposed on the Union. Stanton pursued a rational strategy with sufficient competence and vigor to meet the burden of "some minimal investigation of employee grievances," and showed no "egregious disregard for union members' rights constitut[ing] a breach of the union's duty." *Castelli,* 752 F.2d at 1483 ("that the Union business representative spent no more than one and a half hours in investigation and preparation for arbitration, and did not call key witnesses, constituted neither arbitrariness nor bad faith").

### E. Right to a Private Attorney

Finally, Garcia alleges that the Union interfered with his right to retain a private attorney. He claims Union representatives informed him that it was "against Illinois law for him to have his own attorney." Appellant's Br. at 6. The Union denies having made the statement. Appellee Local 1031's Br. at 30. Again, however, for purposes of summary judgment we must view the record and all inferences drawn from it in the light most favorable to the opposing party. *Karazanos v. Navistar Intern. Transp. Corp.,* 948 F.2d 332 (7th Cir.1991).

In addressing this issue, we certainly recognize the importance of the right to seek the advice of an attorney. Employment dis-

putes often involve complex issues of labor law, and it is understandable that an employee receiving union representation would also wish to speak to a private attorney about his case. As discussed above, union attorneys not only represent individual employees, but the union as a whole. They are rightfully motivated by potentially conflicting concerns for the union and the collective bargaining process. Accordingly, union priorities may sometimes adversely affect the interests of the individual employee. Employees thus have an interest in retaining an attorney with no such conflict of interest to advise them of the process, their options and the merits of the case. *Seymour,* 666 F.2d at 209–10.

■ However, there are limitations which may be placed on one's right to counsel in the unique context of labor relations. Unions are given considerable discretion in handling grievance procedures. This discretion includes the right to limit the role of outside attorneys in the grievance process. *See, e.g., Seymour,* 666 F.2d at 209; *Castelli,* 752 F.2d at 1483 ("no court has adopted the rule that employees are entitled to independently retained counsel in arbitration proceedings, or that the exclusion of such attorneys from arbitration violates the duty of fair representation"); *Malone v. United States Postal Service,* 526 F.2d 1099 (6th Cir.1975) (holding that a Postal Services employee is not entitled to be represented by someone other than the exclusive union representative in arbitration proceedings).

■ Garcia claims that a jury could find that the Union acted arbitrarily because the Union's standard practice was to allow employees to hire their own attorneys, and to allow them to be present at the arbitration hearing, so long as the Union representatives were the only ones presenting the case to the arbitrator. However, a plaintiff must show more than a union's failure to act in accordance with its standard procedure to establish that the union's activities were arbitrary.[5] Just as when a union decides not to

---

5. In *Castelli,* 752 F.2d at 1483, the court noted that a union that customarily provides an attorney to union members at arbitration proceedings could not refuse to provide an attorney for non-

union members. Such a failure to follow customary practice would be discrimination against non-union members and thus a violation of the duty of fair representation. Garcia, however,

pursue a case, its decision to disallow the presence of an independently-retained attorney in a particular case is not, standing alone, enough to show that the union acted arbitrarily. It is the union's prerogative to make such decisions in the grievance process to protect the interests of the union as well as the employee. Here, the Union representative may have exercised his discretion to prevent an attorney from participating in the arbitration hearing because he felt the attorney's presence might encourage arguments which were meritless and misrepresented the case. *Castelli*, 752 F.2d at 1484 ("the participation of an employee's privately owned counsel in the grievance process could bypass the union and undermine the policy of exclusive representation").

■ However, Garcia complains not only about the Union's refusal to allow an outside attorney to participate in the proceedings, but also about the Union's misrepresentations regarding his right to consult an attorney at all. He claims that the Union representatives led him to believe that merely seeking the advice of an independently retained counsel would be against the law, and that he was thus misled as to the nature of his rights. Garcia argues that a jury could find the Union's statement arbitrary or made in bad faith.[6]

Garcia analogizes his situation to that in *Seymour*, 666 F.2d 202, where the Fifth Circuit found that unions may not unduly preclude an employee from retaining independent counsel. In *Seymour*, the union informed the employee that it would not pursue his grievance unless he fired his attorney. He refused to fire his attorney, and the union refused to pursue his claim. The *Seymour* court recognized that the union had considerable discretion in handling employee grievances, and could choose not to pursue even meritorious grievances without giving

rise to a breach of the duty of fair representation. *Id.* at 208. However, the court found that the union had refused to pursue the grievance merely because Seymour refused to fire his attorney. The court concluded that such an insupportable motive was arbitrary and that the union had violated its duty of fair representation. *Id.*

In *Seymour* the union's actions clearly caused harm to the employee. Because of its objection to his attorney, the union did not pursue Seymour's grievance at all. There was no question there that the outcome could have been different had the union not barred the attorney. Yet in Garcia's case there is no such evidence of harm. Even if we accept the possibility that a jury could find that the Union, arbitrarily or in bad faith, told Garcia that he was not allowed to have a private attorney, Garcia has not established that the outcome would probably have been different had he retained a private attorney. *Conn v. GATX Terminals Corp.*, 18 F.3d 417 (7th Cir.1994) (plaintiff cannot recover for harmless breach of duty of fair representation); *Souter v. International Union*, 993 F.2d 595 (7th Cir.1993); *Ooley*, 961 F.2d 1293. Garcia offered no proof to this court or to the district court that there was any possibility of a different outcome had he retained his own attorney. He concedes that he had no right to be represented by his own counsel at any step of the grievance process, including the arbitration hearing, Mem.Op. at 23, and claims only that his personal attorney would somehow have enabled Garcia to play a less passive role in the proceedings. However, Stanton was allowed to pursue his own strategy, and was not required to follow any advice from an outside attorney. Again, Stanton's concerns here involve both Garcia and the Union itself. It is quite possible that Stanton chose the course he did because he was afraid of damaging the Union's credibility if he put Garcia on the stand to contradict

---

was a union member, and makes no, nor has grounds for any, claim of discrimination.

**6.** Under the arbitrariness prong, Garcia would have to show that the statement was unreasonable. However, if he can show that the Union made the statement in bad faith, Garcia would not have to prove that it was unreasonable. *See Black*, 15 F.3d at 584 n. 18 ("As a matter of

course, bad faith or discriminatory conduct cannot ever be reasonable."). *See also Ooley*, 961 F.2d at 1303 (noting that while a plaintiff may be unsuccessful in a claim that a decision not to proceed with a meritless claim is arbitrary, he may still be able to establish breach of duty of fair representation by showing that the union acted in bad faith).

his own written and oral statements once again. A private attorney would have had no power to force Stanton to follow a strategy that Stanton found detrimental to the Union. Thus even if Garcia had hired his own attorney, he provides no evidence that it would have made a difference in the outcome of his case.

Therefore, although we are certainly in general unsympathetic to union efforts to block the hiring of private attorneys, Garcia simply has not offered sufficient proof to establish a viable claim of arbitrary or bad faith conduct.

For these reasons, the judgment of the district court is

AFFIRMED.