G. Steven GWIN, Plaintiff,

v.

**NATIONAL MARINE ENGINEERS BENEFICIAL ASSOCIATION, et al., Defendants.**

Civil Action No. 95–1872 (JR).

United States District Court, District of Columbia.

May 1, 1997.

John M. Clifford, Christine M. Cooper, Peer F. Butcher, McLeod, Watkinson & Miller, Washington, DC, for plaintiff.

Douglas P. Lobel, Kelley, Drye & Warren, Washington, DC, Kenneth Kirschner, Kelley, Drye & Warren, New York City, for Energy Transp. Corp.

Edward M. Gleason, Jr., Dist. No. 1–PCD, MEBA (AFL–CIO), Washington, DC, Richard W. Gibson, Mooney, Green, Baker, Gibson & Saindon, Washington, DC, for Nat. Marine Engineers' Beneficial Ass'n (AFL–CIO).

## MEMORANDUM

ROBERTSON, District Judge.

Plaintiff Steven Gwin brought this action pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, against his former employer, Energy Transportation Corporation (ETC) and his former labor union, National Marine Engineers Beneficial Association (MEBA). Defendants' motion for summary judgment was granted by order dated March 4, 1997. This memorandum sets forth the reasons for that ruling.

### Facts

Gwin was employed by ETC as master of a liquefied natural gas tanker, the LNG Libra, serving routes between Indonesia and Japan. In January 1995, ETC and MEBA were in the midst of negotiating the terms of a new collective bargaining agreement. The Libra was en route from Arun, Indonesia to Osaka, Japan. Gwin's 125-day tour of duty was scheduled to end in Osaka.

On January 16, 1995, several of Libra's crew (not including Gwin) sent a telex to MEBA's president, to ETC, and to ETC's customer. The telex indicated that crew members might quit if the union accepted certain of ETC's demands and that, if they quit, the delivery of Libra's cargo would be

jeopardized. In accordance with standard procedure, a copy of the telex was posted on Gwin's cabin door. Gwin took no action in relation to the telex.

On January 17, Gwin received a telex informing him that the arrival of his replacement in Osaka would be delayed because of an earthquake. That same day, Gwin informed ETC by telex that he intended to take his vacation leave as scheduled upon the Libra's arrival in Osaka, that he was "totally burnt out," and that he did not consider himself "competent to continue as master without rest." ETC granted Gwin's request and placed the chief mate temporarily in command, pending the arrival of Gwin's replacement.

In early February, Gwin began to hear rumors that ETC was blaming him for the telex from Libra's crew. He contacted MEBA for assistance and was directed to its attorney, Richard Hirn, for legal advice. On February 6, 1995, ETC called Gwin and requested that he attend a meeting in New York to discuss his conduct aboard the Libra. Gwin declined and instead contacted Hirn and filed a grievance.

On February 9, 1995, Gwin had a telephone conversation with Martin Matson, an ETC executive. They discussed the events of January 16 and 17, as well as the status of the pending collective bargaining negotiations. Gwin secretly recorded the conversation. Later, he contacted Hirn, told him about the conversation, and sent him a copy of the tape (whether Gwin offered or Hirn asked for it is in dispute). Gwin placed no restrictions or conditions on Hirn's use of the tape. Gwin understood at the time that Hirn was representing MEBA and its members, including Gwin himself, in the contract negotiations.

In April 1995, ETC and MEBA submitted their contract disputes to arbitration. During the arbitration proceedings, Hirn revealed to Matson that Gwin had recorded their February 9 conversation and used a transcript of the tape to impeach Matson's testimony as to the necessity of a wage cut. Matson was embarrassed by this revelation.

On May 5, 1995, Gwin met with ETC representatives. The union offered to provide Gwin with counsel and retained Jacob Shisha to represent him. By letter dated May 11, 1995, ETC demoted Gwin and transferred him from his position as master of the Libra for (1) allowing the crew to send the January 16 telex, (2) taking vacation leave before the replacement captain was aboard, and (3) secretly recording the Matson telephone call.

At Gwin's request, MEBA filed a grievance on the demotion. A hearing was held before Arbitrator Gold on June 7, 1995. At the hearing, the union's representation of Gwin was conducted by Hirn. Hirn met with Gwin for three hours on June 6 to prepare for the hearing. In addition, Hirn prepared an outline of direct and cross-examination of witnesses, including Gwin, as well as evidence and exhibits to be introduced. At the hearing, the company presented two witnesses. Hirn presented the union's case through opening argument, cross-examination of the witnesses, documents submitted into evidence, and the direct testimony of Jerry Hale. Hale, the radio officer aboard the Libra, testified that Gwin had no prior knowledge of the Libra telex. During the hearing, Hirn advised Gwin not to testify, based upon his belief that the union had refuted ETC's evidence and his concern that Gwin would damage his case. In particular, Hirn was concerned that Gwin would reveal his involvement in obtaining a strike vote, information that Hirn had learned during his preparation with Gwin. Although Gwin had expressed his desire to testify to Hirn, he did not insist on testifying.

Arbitrator Gold issued her decision on June 11, 1995, upholding ETC's actions. Gold found that ETC's actions were reasonable in light of Gwin's own admission of "burn out" and incompetency. Gold also concluded that Gwin failed to exercise due diligence with respect to the Libra telex, both in preventing its transmission and in disciplining the officers. As to the incident involving the taped telephone conversation, Gold found that although it was not sufficient to warrant discipline, it was indicative of what ETC perceived to be Gwin's "divided loyalties."

Thereafter, Gwin filed this action against ETC and the Union. Gwin alleges that MEBA breached its duty of fair representation by (1) divulging the taped conversation; (2) failing adequately to represent him in connection with the June 1995 arbitration hearing; and (3) failing to appeal the arbitrator's decision. In particular, Gwin alleges that Hirn's perfunctory representation was caused by Hirn's desire not to reveal his "ethical breach" in using the tape provided by Gwin. Gwin further alleges that ETC violated § 301 of the LMRA by demoting him in breach of the collective bargaining agreement and that the only reason for demoting and transferring him was Matson's embarrassment when he was confronted with Gwin's tape during the ETC–MEBA arbitration. Gwin claims that the other reasons given by ETC for its decision to demote and transfer him were pretextual.

### Analysis

Plaintiff's § 301/fair representation action is a "hybrid" suit comprising two causes of actions. *Reed v. United Transp. Union*, 488 U.S. 319, 328, 109 S.Ct. 621, 627, 102 L.Ed.2d 665 (1989). To prevail on either claim, plaintiff must prove a violation of the collective bargaining agreement and demonstrate the union's breach of the duty of fair representation. *Chauffeurs, Teamsters & Helpers, Local Union 391 v. Terry*, 494 U.S. 558, 564, 110 S.Ct. 1339, 1344, 108 L.Ed.2d 519 (1990). The duty of fair representation is addressed first, because it is the "indispensable predicate" to the suit against the employer. *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 62, 101 S.Ct. 1559, 1564, 67 L.Ed.2d 732 (1981).

■ A union breaches its duty of fair representation if its conduct is arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967). This standard applies to all levels of a union's representation, from contract negotiations to enforcement and grievance proceedings. *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 77–78, 111 S.Ct. 1127, 1135–36, 113 L.Ed.2d 51 (1991). A union is entitled to great deference in performing its representational duties. *Id.* at

78, 111 S.Ct. at 1136. A union's actions are arbitrary only if they are "so far outside a wide range of reasonableness as to be wholly 'irrational.' " *Id.* A union will be deemed to have acted in bad faith when there is substantial evidence of "fraud, deceitful action, or dishonest conduct." *Humphrey v. Moore*, 375 U.S. 335, 348, 84 S.Ct. 363, 371, 11 L.Ed.2d 370 (1964). To prevail on a claim that the union breached its duty of fair representation on a grievance that proceeded to arbitration, an employee must also demonstrate that the union's conduct "seriously undermined the arbitral process" and contributed to the allegedly erroneous outcome of the contractual proceedings. *United Parcel Service, supra*, 451 U.S. at 62, 101 S.Ct. at 1564.

#### 1. Use of tape without authorization

■ Gwin claims that MEBA violated its duty of representation by using the secretly recorded telephone conversation to impeach Matson at the contract arbitration hearing. Gwin argues that he had a reasonable expectation that Hirn, an attorney representing him in the grievance procedures, would keep the tape confidential. The union argues that Gwin placed no restrictions on use of the tape when he forwarded a copy to Hirn and that Gwin's "expectation" was unreasonable in light of the circumstances.

■ No evidence in the record supports a finding that Hirn's use of the tape violated the union's duty of fair representation. Gwin concedes that when he forwarded the tape to Hirn, he neither placed restrictions on its use, nor indicated that the tape's existence should not be disclosed. (Gwin Dep. at 99–100.) He takes the position, however, that Hirn owed him an implied duty of confidentiality as his attorney. It is well established, as a matter of law, that an attorney handling a labor grievance on behalf of a union does not enter into an "attorney-client" relationship with the union member asserting the grievance. *See Peterson v. Kennedy*, 771 F.2d 1244, 1258 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986); *Montplaisir v. Leighton*, 875 F.2d 1, 6 (1st Cir.1989). It is undisputed that Hirn was retained by the union to act as its outside counsel and that the union referred

Gwin to Hirn in connection with Hirn's duties as union counsel. It is established, further, that when Gwin sent the tape to Hirn, he understood that Hirn was representing MEBA and all its members in the contract arbitrations. (Gwin Dep. at 38, 76).

■ Furthermore, an attorney acting as an agent of the union has an obligation to act for the benefit of all its members, even if the majority interest clashes with individual interests. *See Vaca, supra,* 386 U.S. at 182, 87 S.Ct. at 912; *Griffin v. Air Line Pilots Ass'n,* 32 F.3d 1079, 1083 (7th Cir.1994). In the absence of any evidence to support a reasonable expectation of confidentiality, Hirn's decision to use the tape in contract negotiations was not arbitrary or in bad faith. If Hirn had an ethical obligation to not disclose the tape, Gwin's claim does not lie against the union.

### 2. *Arbitration hearing*

■ Gwin alleges that the union's representation at the arbitration hearing was perfunctory and in bad faith because Hirn failed to present necessary evidence and did not allow him to testify. The union argues that Hirn's representation was competent and that the challenged decisions were strategic ones that were not "irrational" or motivated by bad faith.

■ In order to find that a union's representation was "perfunctory," evidence that the union acted with reckless disregard for the employee's rights is required. *See Castelli v. Douglas Aircraft Co.,* 752 F.2d 1480, 1482 (9th Cir.1985). Mere negligence does not arise to the level of a breach of the duty of representation. *Id.* A union's duty does require some "minimal investigation" of an employee's grievance, *id.* at 1483 (spending no more than one and half hours for investigation and preparation and failing to call key witnesses not perfunctory), but the quantum that will be considered "minimal" is quite small. In *Garcia v. Zenith Elecs. Corp.,* 58 F.3d 1171, 1178–79 (7th Cir.1995), the court found that the union's representation was not perfunctory despite the fact that the union's representative put on no evidence of its own, failed to call any witnesses and rested at the end of the employer's case. In the present case, it is undisputed that Hirn met with Gwin for several hours prior to the hearing; spent additional hours preparing outlines of examination questions; cross-examined ETC's witnesses; submitted evidence on behalf of Gwin; and presented Hale's testimony.

Nor does the record support Gwin's claim that the union's failure to present his testimony was a breach of duty. Gwin contends that Hirn's failure to call him to the stand was a direct result of Hirn's desire to conceal the fact that he disclosed the recorded tape. Gwin submits that, had he testified, he would have explained his comments regarding his competency in the Libra telex and his reasons for recording the conversation with Matson. The union responds that the decision not to call Gwin to the stand was a strategical one, and that it was based upon concerns that Gwin would make damaging admissions regarding his participation in a strike vote, as well as general concerns regarding his credibility.

■ Gwin's conclusory allegations that Hirn did not call him to the stand because of a "conflict of interest" created by the use of the recorded tape are unsubstantiated and are insufficient to create a genuine dispute of material fact. *See Garcia, supra,* 58 F.3d at 1177–78 (failure to call grievant to the stand is strategic). Gwin's reliance on *Achilli v. John J. Nissen Baking Co.,* 989 F.2d 561 (1st Cir.1993), in which the court found that the union had acted in bad faith in representing a shop steward due to a conflict of interest, is misplaced. In that case, the court's finding was based on the union's failure to present evidence that it had secretly instructed the shop steward to engage in the work stoppage that resulted in the steward's termination. *Id.* at 563–64.

### 3. *Failure to appeal arbitrator's decision*

■ Gwin contends, finally, that the union's decision to not pursue an appeal from the arbitrator's ruling breached its duty of fair representation. The question of whether a duty of fair representation can be based on a union's failure to appeal an arbitrator's award is open to debate, *see Freeman v.*

*Chauffeurs, Teamsters, Warehousemen, and Helpers,* 746 F.2d 1316 (7th Cir.1984) (finding no such duty); *Sear v. Cadillac Automobile Co. of Boston,* 654 F.2d 4, 7 (1st Cir.1981) (duty exists only in "unusual circumstances"), and has not been addressed in this circuit. Even if the court were to assume that such a duty does exist, however, there is no evidence in this record to suggest that the union's decision not to appeal was arbitrary or in bad faith. The union's position that an appeal would be futile was not unreasonable in light of the broad deference accorded arbitration rulings. *See American Postal Workers Union v. United States Postal Service,* 52 F.3d 359, 361 (D.C.Cir.1995) ("Our scope of review of an arbitrator's award ... is extremely narrow.").

Having determined that there is no genuine issue of material fact on the issue of the union's duty of fair representation and that the union is entitled to judgment as a matter of law, the court need not reach the issue of whether ETC breached the collective bargaining agreement in demoting and transferring Gwin.