**Alvin Logan MAINS, Plaintiff–Appellant,**

v.

**LTV STEEL COMPANY, et al., Defendants–Appellees.**

No. 00–3282.

United States Court of Appeals, Sixth Circuit.

Dec. 8, 2003.

914

Howard V. Mishler, Westlake, OH, for Plaintiff–Appellant.

Kathleen M. Kordeleski, Duvin, Cahn & Hutton, Cleveland, OH, Charles R. Armstrong, Niles, OH, Amanda Green, Assistant General Counsel, Pittsburgh, PA, for Defendants-Appellees.

Before CLAY and COOK, Circuit Judges; and STAFFORD, District Judge.*

CLAY, Circuit Judge.

Plaintiff Alvin L. Mains appeals from the January 31, 2000, order issued by the United States District Court for the Northern District of Ohio, Honorable Solomon Oliver, Jr., presiding, granting summary judgment in favor of Defendants LTV Steel Company ("LTV") and Local 2265, United Steelworkers of America ("the Union"), in this action under § 301 of the Labor Management Relations Act for breach of the collective bargaining agreement and breach of the duty of fair representation. For the reasons set forth below, this Court AFFIRMS the district court's order.

I

On January 11, 1998, Plaintiff filed a complaint in the U.S. District Court for the Northern District of Ohio against LTV Steel Company (his former employer); Local 2265, United Steelworkers of America (his union); and three individuals—Mark Clark, John Kolibab and Gary Snow. Plaintiff's complaint alleged that LTV had breached the collective bargaining agreement when it discharged him from employment on December 10, 1997, purportedly because he had moved his crane toward two employees in a threatening manner. The complaint further alleged that the Union had breached its duty to fairly represent Plaintiff throughout the grievance process, which concluded with an arbitrator's award finding in favor of LTV. Plaintiff alleged claims under Section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621.

Plaintiff voluntarily dismissed individual Defendants Clark, Snow and Kolibab on June 10, 1999. On September 29, 1999, after the completion of discovery, Defendants LTV and the Union jointly moved for summary judgment. In ruling on the summary judgment motion, the district judge found that there was no genuine issue of material fact that LTV had breached the collective bargaining agreement because the arbitrator's decision had been "rationally based upon the express terms of the agreement, and did not impose additional requirements not found in the agreement." The court further found that Plaintiff's duty of fair representation claim against the Union necessarily failed if his claim against LTV failed. Neverthe-

* The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

less, the court, assuming *arguendo* that the arbitrator's decision had been erroneous, found that there was no genuine issue that the Union had breached its duty to fairly represent Plaintiff in the grievance process. The district court found that the Union's handling of his grievance all had "rational, strategy-related reasons" and further that there was no evidence that the alleged animosity the Union had toward Plaintiff in any way affected the Union's representation of Plaintiff. The district court granted Defendants' motion on January 31, 2000 and dismissed the case.

Plaintiff filed his notice of appeal of the district court's summary judgment order on February 29, 2000. Plaintiff does not challenge the dismissal of his ADEA claim.

## II

Plaintiff had been employed with LTV for approximately 27 years and as a crane operator for ten of those years when, on December 10, 1997, he committed an action that led to his termination. On that day, Plaintiff had been operating a crane, loading coils from a conveyor onto a buggy. The crane utilized a so-called Heppenstal lifting device to place the coils on the buggy. The Heppenstal weighs approximately 8,000 to 10,000 pounds and could severely injure or kill a person on the ground if the locking device is not completely secured. John Kolibab, a supervisor, and Mark Clark, a co-worker, had gone to check on Plaintiff's progress in loading the coils because they allegedly had heard from another employee (Gary Snow) that Plaintiff had been loading the coils too slowly and/or had been placing the coils so close together on the buggy that the coils' identification numbers could not be read.

When Kolibab approached Plaintiff's work area, Plaintiff was in the process of loading the fourth and fifth coils onto the buggy. Kolibab observed that Plaintiff had been placing the coils too close together. Kolibab waited for Plaintiff to begin placing the sixth coil on the buggy and then positioned himself so Plaintiff could see him. Kolibab then signaled to Plaintiff to lower the sixth coil a few inches over from the fifth coil. According to Kolibab, Plaintiff slammed the sixth coil down on the buggy, causing it to slide approximately two feet away from the fifth coil. Kolibab and Clark then turned around and began to exit the building. After walking about 14 to 15 steps, Kolibab turned to say something to Clark and realized that the Heppenstal was directly over his shoulder about ten feet in the air.

Plaintiff claims that his view of the work area was obstructed from the crane and that he did not see Kolibab linger in the area after directing the placement of the sixth coil. According to Plaintiff, after sounding the siren on the crane to indicate he was commencing work again, he inadvertently passed the Heppenstal lifting device over the heads of Kolibab and Clark. Kolibab and Clark counter that Plaintiff in fact could see them in the work area at the time he moved the Heppenstal device.

Kolibab lodged a formal complaint with LTV's area manager, Jack Bronson, claiming that Plaintiff had purposefully come at him and Clark with the Heppenstal lifting device. Kolibab was quite distraught when he relayed his complaint to Bronson, a fact which rendered Kolibab's account credible in Bronson's mind. Based on Kolibab's report, Bronson told Kolibab to fire Plaintiff.

Shortly thereafter, Kolibab and Bronson confronted Plaintiff at his crane. Plaintiff descended from the crane landing, and Kolibab gave him a piece of paper (an "exit pass") indicating that Plaintiff was being sent home and that he was not to return to

work until he had a meeting with the plant superintendent on December 12. Plaintiff asked, "What's this for?" to which Kolibab replied in words to the effect, "for coming at us," "coming at me with the crane," or "for coming at me with the Heppenstal." (J.A. 32, 46, 188). According to Bronson, Plaintiff responded, "You saw me coming, but I'm not going to argue with it." (J.A. 32).

Plaintiff has provided at least two versions of his response to Kolibab's question. According to his affidavit filed in the court below, Plaintiff responded, "If you saw me coming," but then cut himself off, took the pass and continued, "I'm not going to argue with you." (J.A. 188) At deposition, Plaintiff testified that he said, "if you had seen me coming why didn't you-" and then cut himself off. (J.A. 265, 325, 350–51.) In any event, Bronson interpreted Plaintiff's "you saw me coming" statement (or words to that effect) to mean that Plaintiff had seen Kolibab and Clark at the time he moved the Heppenstal toward them. It also was Bronson's view that if Plaintiff had moved the crane in a normal fashion, the Heppenstal would have passed a great distance from Kolibab and Clark. Plaintiff's lack of explanation or remorse for his conduct after the incident solidified Bronson's view that Plaintiff's actions with the crane had been intentional.

Plaintiff's union representative, John Vorous, immediately requested a meeting with management, which was held on December 12, 1997. After that meeting, management representatives Jack Bronson and Keith Booker "provisionally" discharged Plaintiff and denied him the benefit of the "Justice and Dignity" provisions of the collective bargaining agreement, which would have allowed Plaintiff to continue working pending the resolution of the grievance procedure.

The applicable collective bargaining agreement required all discharges to be provisional for five calendar days during which time the employee could request a "Step 2" hearing, which Plaintiff did. A Step 2 provisional discharge hearing was conducted on December 18, 1997. Management reaffirmed its discharge decision at Step 2, and Plaintiff then filed a Step 3 grievance on December 23, 1997. His Step 3 grievance alleged that LTV had violated Articles 14 and 15 and Appendix D–2 of the collective bargaining agreement by discharging him for gross misconduct and not allowing him to work during the pendency of his grievance. LTV contended that it did not violate Article 15, which affords management "the right to hire, suspend or discharge for proper cause ... [e]mployees from duty because of lack of work or for other legitimate reasons." (J.A. 28.)

A Step 3 meeting—which was a mini-hearing with witness testimony—was held on January 8, 1998 between Union and company officials. The Union did not grieve a claim under Article 14 (for severance pay), but did advance Plaintiff's wrongful discharge claim under Article 15 and the "Justice and Dignity" claim under Appendix D–2 to the Agreement, which provides that management shall not remove an employee from active work on the job prior to a final determination of the merits of a discharge.

After the Step 3 process, the Union signed the official minutes of the Step 3 meeting, which recounted "an abstract of the important aspects of the Third Step discussion and brief statements of the parties' positions." (J.A. 45–47.) Included in those minutes was a brief description of the verbal interchange between Kolibab and Plaintiff after the crane incident:

Mains was summoned to come down from the crane and when he was pre-

sented with the [exit] pass he asked, "What's this for?" In response Kolibab stated, "Coming at me with the crane!" Mains replied "You saw me coming." (J.A. 47.) Plaintiff characterizes these minutes as a "stipulation" by the Union as to Mains' words and actions on that day. LTV denied the Union's request to adjust the grievance, and then Plaintiff appealed his grievance to Step 4—arbitration.

The Step 4 arbitration took several days, and many witnesses were called. During the hearing, the arbitrator observed that, based to a large degree on the Union's cross-examination of Kolibab and Clark, there was considerable confusion and disagreement regarding the directions Kolibab, Clark and Plaintiff's crane were traveling at the time of the incident, as well as the distances the foregoing had traveled at any given point during the incident. To help clarify the testimony, the arbitrator suggested establishing reference points in the hearing room in order to simulate the events of December 10, but this approach proved fruitless. Instead, the arbitrator, with the agreement of the parties, conducted a visit to the plant where the incident had occurred and permitted a demonstration of the crane Plaintiff had been operating.

With the benefit of the plant visit, the arbitrator found that Plaintiff and Kolibab actually agreed on the directions and Kolibab's location at all critical times. Specifically, the arbitrator found that all critical witnesses ultimately agreed that, after Kolibab had directed Plaintiff's placement of the sixth coil, Plaintiff moved the crane in the same direction in which Kolibab had been walking. The arbitrator further found that Plaintiff's movement of the crane toward Kolibab and Clark was deliberate. The arbitrator partially based this conclusion on the "you saw me coming" statement that LTV had attributed to Plaintiff. The arbitrator noted that Plaintiff had offered no explanation for this statement, despite knowing how important this statement was to management's decision to discharge him. The arbitrator also noted that on prior occasions Plaintiff had inadvertently passed the Heppenstal device over the heads of pedestrians below but had apologized because of the serious safety risk posed by such actions. After the December 10 incident, however, Plaintiff expressed no surprise or regret. On these facts, the arbitrator found that Plaintiff's "you saw me coming" statement supported management's conclusion that Plaintiff had deliberately moved the Heppenstal close to Kolibab in order to threaten him. The arbitrator therefore denied Plaintiff's grievance on August 8, 1998 and upheld his discharge.

## III

Plaintiff has alleged a claim under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). It is a "hybrid" action, meaning that he is claiming both that LTV discharged him in violation of the collective bargaining agreement and that the Union breached its duty of fair representation in advancing his grievance through arbitration. To prove that the Union breached its duty of fair representation, Plaintiff must establish two things: (1) the Union's conduct toward Plaintiff was hostile, discriminatory, in bad faith, dishonest or arbitrary, *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), and (2) that the impact of the Union's breach on the outcome of the grievance process was "substantial," *Dushaw v. Roadway Express, Inc.,* 66 F.3d 129, 132 (6th Cir.1995), i.e., that the process was "'seriously flawed by the union's breach.'" *Black v. Ryder/P.I.E. Nationwide, Inc.,* 15 F.3d 573, 585 (6th Cir.1994) (quoting *Hines v. Anchor Motor Freight,*

918

*Inc.,* 424 U.S. 554, 570, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976)) (emphasis added in *Black* ).

The first element of proof requires more than evidence that the Union was negligent, exercised poor judgment or demonstrated "slightly unreasonable behavior." *Id.* at 584 ("[M]ere negligence or poor judgment on the part of the union will not support a claim of unfair representation."); *see also United Steelworks of Am., AFL–CIO–CLC v. Rawson,* 495 U.S. 362, 372–73, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990)(holding that "mere negligence ... [does] not state a claim for breach of the duty of fair representation"); *Poole v. Budd Co.,* 706 F.2d 181, 183 (6th Cir.1983) ("... [M]ere negligence or mistaken judgment is insufficient to establish a breach of the union's duty.") (citations omitted). Rather, "[a]ny substantive examination of a union's performance ... must be highly deferential...." *Air Line Pilots Ass'n Int'l v. O'Neill,* 499 U.S. 65, 78, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991). Plaintiff must show, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior [to be] so far outside a 'wide range of reasonableness' ... as to be irrational." *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127 (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953)). Accordingly, "[u]nion representatives are not to be strictly held to the standards of attorneys." *Poole,* 706 F.2d at 185. "What is required to be shown goes considerably beyond the requirements of a malpractice suit." *Garcia v. Zenith Elec. Corp.,* 58 F.3d 1171, 1176 (7th Cir.1995).

We review the district court's grant of summary judgment in favor of the Union and LTV under a *de novo* standard of review. *Martin v. Ohio Turnpike Comm'n,* 968 F.2d 606, 609 (6th Cir.1992) (citing *EEOC v. Univ. of Detroit,* 904 F.2d 331, 334 (6th Cir.1990)). Since Plaintiff alleges that the Union's conduct tainted the grievance process, this Court initially must determine whether there is a genuine issue of material fact that the Union breached its duty of fair representation and, if so, whether that breach likely determined the arbitrator's award in favor of LTV. If there is no evidence of a breach by the Union and/or no evidence that the breach likely was outcome-determinative, then the arbitration award is unassailable, and there would be no basis to Plaintiff's claim against the Union or LTV. *See Dushaw,* 66 F.3d at 132–33 (holding that the plaintiff alleging a hybrid claim must prove both a breach of the union's duty and that the breach more than likely impacted the outcome of the grievance procedure; reversing district court's judgment against the union and the employer because there was insufficient evidence that the grievance process was tainted by alleged union misconduct); *VanDerVeer v. United Parcel Serv., Inc.,* 25 F.3d 403, 405–06 (6th Cir.1994) (affirming grant of summary judgment for union and employer in hybrid action because there was no evidence of any nexus between the alleged hostility of union member and the outcome of the arbitration). If, and only if, there is a genuine issue of material fact of a breach by the Union that probably impacted the arbitrator's just cause finding, would a jury have to decide not only whether the Union breached its duty of fair representation but also whether LTV had just cause to terminate Plaintiff's employment. *E.g., Black,* 15 F.3d at 585 (upholding jury verdict against union and employer in hybrid action because the union had failed to present evidence during the grievance process that would have shown that the plaintiff did not commit the misconduct alleged by the employer).

## IV

Plaintiff has proffered five major criticisms of the Union's advocacy during the grievance process. These criticisms either lack a factual basis, are not sufficient to establish a breach of the duty of fair representation, or both.

A. The Union's Alleged Failure to Proffer Plaintiff's Testimony on the "You Saw Me Coming" Statement

■ "[I]f a union fails to present favorable evidence during the grievance process, this failure may constitute a breach of its duty only if that evidence probably would have brought about a different decision." *Black*, 15 F.3d at 585 (citation omitted). Based on this proposition, Plaintiff argues that the Union never should have "stipulated" at Step 3 that Plaintiff had made the "you saw me coming" statement in response to Kolibab's statement that Plaintiff had come after him with the crane. Since this statement was so crucial to the arbitrator's decision, argues the Plaintiff, it was "gross negligence" on the union's part to stipulate and to never attempt to clarify what Plaintiff meant by this statement. He further argues that if the Union had permitted him to testify at Step 4 (the arbitration) that he actually had responded, "*if* you had seen me coming why didn't you -," then the arbitrator would have altered her ruling one-hundred-eighty degrees.

This Court rejects these arguments. First, there is no evidence that the Union "stipulated" to LTV's version of the facts at Step 3. The plain language of the Step 3 minutes show that they were intended to be "an abstract" and "brief statement" of the parties' positions, not binding judicial

admissions. The arbitrator never even intimated that the minutes constituted a stipulation of any kind. Second, it would require rank speculation to conclude that the arbitrator's decision "probably" would have been different had Plaintiff testified that he actually had responded to Kolibab, "*If* you had seen me coming why didn't you"; this statement is not materially different from the "you saw me coming statement" that LTV had attributed to Plaintiff. Third, although the arbitrator partially based her finding that LTV had just cause to fire Plaintiff on his failure to explain the "you saw me coming" statement, that was not the sole reason. The other, independent reasons included: (1) Plaintiff was aware of at least Clark's presence in the area at the time he operated the crane; (2) Kolibab and Plaintiff testified consistently about the direction in which the crane had traveled and Kolibab's location during the incident; (3) Kolibab was extremely upset when he reported the crane incident to Bronson, rendering his report credible in Bronson's mind; and (4) on previous occasions in which Plaintiff had accidentally brought the Heppenstal over the heads of employees, he had apologized, but did not do so in this case. In light of the arbitrator's factual findings that Plaintiff moved the crane over the employees' heads [2] and was unapologetic for doing so,[3] which alone support an inference of deliberate action, Plaintiff has not created a genuine issue that the arbitrator "probably" would have ruled in his favor had he testified that he actually prefaced the "you saw me coming statement" with the preposition "if."

■ Assuming *arguendo* that Plaintiff's testimony would have swayed the arbitra-

---

2. Indeed, Plaintiff's complaint alleges that he lifted the Heppenstal device over the employees' heads "inadvertently and/or accidentally." (J.A. 10, ¶ 16).

3. Plaintiff testified at deposition that he never would have apologized for the incident.

tor, there is no genuine issue of material fact that the Union's decision not to present this testimony amounted to a breach of its duty to represent Plaintiff fairly. The record evidence indisputably shows that the Union extensively considered the import of the "you saw me coming statement" and adopted a very specific and reasonable strategy for dealing with it at the arbitration. First, Mark Shaw, Plaintiff's Union representative during the arbitration, made a strategic decision not to have Plaintiff clarify the "you saw me coming statement" because Plaintiff's acknowledgment of this comment or similar words might appear to contradict the theory that Plaintiff had not moved his crane, intentionally or otherwise, toward Kolibab and Clark. Second, although Shaw's strategy precluded Plaintiff's testimony on the "you saw me coming statement," Shaw closely cross-examined Bronson about why he had not asked Plaintiff what he had meant by the somewhat ambiguous statement. It cannot be said that Shaw's strategy exceeded the bounds of reasonableness. *See Garcia*, 58 F.3d at 1177–78 (holding that it was not the court's job to substitute its judgment for the union's with regard to contesting the facts at the plaintiff's arbitration, "even if, with the benefit of hindsight, it appears that the union could have made a better call"; union's choice not to have the plaintiff testify "was not an arbitrary act but a strategy decision") (internal quotation marks and citation omitted).

B. The Union's Alleged Failure to Advise Plaintiff to Apologize

■ Plaintiff claims that the Union should have advised him to demonstrate remorse for his handling of the Heppenstal on December 10. At deposition, however, Plaintiff testified that he would not have apologized. (J.A. 287.) Thus, even if the Union had advised Plaintiff to apologize or to be remorseful, he would not have fol-

lowed the advice. By Plaintiff's own admission, this alleged breach of the Union's duty of fair representation could not have been outcome-determinative.

C. The Union's Alleged Failure to Object to the Re–Enactment with the Crane

■ Plaintiff takes issue with the manner in which the re-enactment of the crane incident took place during the arbitrator's plant visit. He claims that Union representative Shaw failed to object "on the record that the demonstration did not coincide or was not an exact re-enactment of how the Plaintiff operated the crane, and in fact was a substantial deviation from the same." (J.A. 118–19, 197.). Specifically, Plaintiff complains that the crane operator during the demonstration did not lift the hoist to the correct degree, and the arbitrator did not assess Plaintiff's work area properly because she did not sit in the crane's seat, but chose to stand and look out the window. At deposition, however, Plaintiff acknowledged that the Union had objected to some aspects of the re-enactment, such as the lighting, the position of the chair in the crane and the position of Kolibab. Further, Shaw testified that he did object to the manner in which the crane operator had moved the crane as inconsistent with Plaintiff's account. Plaintiff just believes that the Union "should have done more." (J.A. 346.) Such a non-specific objection to the Union's performance at the re-enactment does not create a genuine issue as to whether the Union breached its duty to fairly represent Plaintiff.

D. The Union's Alleged Failure to Advance a Conspiracy Theory

■ Plaintiff complains that Union representative Shaw did not cross-examine Mark Clark, who was with Kolibab when the crane incident occurred. According to

Plaintiff, Clark was biased against him as evidenced by harassment complaints Clark had filed against Plaintiff prior to the December 10 incident. As discussed above, however, this Court must defer to the Union's reasonable strategic choices during the arbitration. Shaw made a reasonable decision not to reveal any hostility between Plaintiff and Clark because the arbitrator might perceive this hostility as a possible motive for Plaintiff's alleged intentional actions.

Plaintiff similarly contends that the Union should have brought out alleged bias by Kolibab and Gary Snow, the employee who had initiated Kolibab's visit to Plaintiff's crane on December 10, 1997. According to his affidavit, Plaintiff had lodged a verbal complaint against Kolibab that he had been permitting Clark to do management work in violation of the collective bargaining agreement. Plaintiff's bias argument, however, is inconsistent with his deposition testimony in which he admitted he had no facts to prove that Kolibab made up the whole crane incident due to bias. Moreover, Plaintiff's deposition testimony indicates that he had had no discussion with his Union representatives about an alleged conspiracy by Kolibab, Snow and Clark to deprive Plaintiff of his employment. Plaintiff discussed only the fact that these individuals did not like him. In fact, Plaintiff admitted that he did not raise his conspiracy theory until *after* the arbitration hearing. Based on these undisputed facts, it was reasonable for the Union to focus its grievance on the crane incident itself, as opposed to the alleged hidden agendas of some of the witnesses. It was not unreasonable for the Union to operate from the assumption that a focus on witness bias would have backfired by suggesting a motive for Plaintiff to have threatened them with the crane.

**E. The Union's Alleged Failure to Adequately Investigate**

■ Plaintiff claims that the Union did not conduct an adequate investigation, namely in the form of witness interviews. He acknowledged at deposition, however, that there was no one else with whom the Union could have spoken who actually witnessed the incident. As noted above, Plaintiff acknowledged at deposition that he never put the Union on notice of his belief that Kolibab, Clark and Snow had conspired to get him fired; he told them only that these individuals did not like him. Again, the Union' strategic decision to focus on the crane incident itself—i.e., whether it occurred as described by the percipient witnesses—and not factors which might suggest a motive for Plaintiff's alleged misconduct with the crane, was eminently reasonable and is not subject to reversal by this Court.

## V

■ Since there is no genuine issue of material fact that Plaintiff's arbitration was tainted by the Union's misconduct or that any such taint was outcome-determinative, then this Court also must affirm summary judgment for LTV, unless the arbitrator's conclusion that LTV had just cause to discharge Plaintiff is otherwise legally defective. "[T]his Court must revert to the 'well-established principle that courts play only a limited role in reviewing labor arbitration awards.'" *Interstate Brands Corp., Butternut Breads Div. v. Chauffers, Teamsters, Warehousemen and Helpers Local Union No. 135,* 909 F.2d 885, 888 (6th Cir.1990) (citing *AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 36, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). This Court must be highly deferential to the arbitrator, particularly with regard to "the substantive issue of what constitutes sufficient and

reasonable cause for discharge." *Id.* (citations omitted).

Plaintiff obliquely argues that the arbitrator's decision somehow violated public policy by not drawing its essence from the collective bargaining agreement and reflected the arbitrator's own notions of industrial justice. Plaintiff appears to argue that the arbitrator "misapplied the concept of public policy as concerning safety in the workplace" because Plaintiff had not engaged in any prior similar conduct and because he did not hurt any person or property with this crane. Plaintiff is misguided.

An arbitral decision fails to derive its essence from a collective bargaining agreement only when:

(1) it conflicts with the express terms of the agreement; (2) it imposes additional requirements not expressly provided for in the agreement; (3) it is not rationally supported by or derived from the agreement; or (4) it is based on 'general considerations of fairness and equity' instead of the terms of the agreement.

*Gen. Teamsters Sales & Serv. & Indus. Union Local No. 654 v. Active Transp. Co.*, No. 97–4010, 1999 WL 68674, at *4 (6th Cir. Jan.12, 1999) (unpublished; citing *Dobbs, Inc. v. Local No. 614, Int'l Bhd. of Teamsters*, 813 F.2d 85, 86 (6th Cir.1987)). Plaintiff has made no affirmative showing on any of these factors. He has not pointed to any conflict between the arbitrator's decision and the express terms of the collective bargaining agreement. Article 15 of the agreement affords management "the right to hire, suspend or discharge for proper cause ... [e]mployees from duty ... for ... legitimate reasons." Discharging an employee for threatening other employees with a crane is a legitimate reason for discharge. Plaintiff has made no allegation that the arbitrator imposed additional obligations that are not found in the collective bargaining agreement. Plaintiff also cannot make a colorable argument that the decision to uphold the discharge of an employee for threatening others with a crane is not rationally supported by the agreement; if such conduct is not a legitimate reason for discharge, it is difficult to imagine what is.

Last, there simply is nothing to Plaintiff's argument that the arbitrator imposed her own brand of industrial justice. Plaintiff has simply re-cast his objections to the arbitrator's adverse factual findings. Further, Plaintiff argues unconvincingly that the arbitrator could not affirm a discharge where no one was hurt and nothing was damaged by Plaintiff's misconduct. To the contrary, it would be irrational to say that an employer cannot discharge an employee who threatens other employees with serious bodily harm or even death. An employer need not reserve discharge only for those employees who successfully carry out their threats.

## VI

As a matter of law, Plaintiff's § 301 claim cannot be sustained based on evidence that the Union's choices, though reasonable during the grievance process, were unsuccessful in retrospect. And because there is no triable issue that the arbitration process was tainted by Union misconduct, the arbitrator's finding that LTV did not breach the collective bargaining agreement must be sustained. Accordingly, the district court's grant of summary judgment to the Union and LTV is hereby AFFIRMED.